PEREZ ET UX. *v.* CAMPBELL, SUPERINTENDENT,
MOTOR VEHICLE DIVISION, ARIZONA
HIGHWAY DEPARTMENT, ET AL.

No. 5175.  Argued January 19, 1971—Decided June 1, 1971

WHITE, J., delivered the opinion of the Court, in which BLACK, DOUGLAS, BRENNAN, and MARSHALL, JJ., joined. BLACKMUN, J., filed an opinion concurring in the result as to petitioner Emma Perez and dissenting as to petitioner Adolfo Perez, in which BURGER, C. J., and HARLAN and STEWART, JJ., joined, *post,* p. 657.

*Anthony B. Ching* argued the cause and filed a brief for petitioners.

*Robert H. Schlosser* argued the cause for respondents. With him on the brief was *Gary K. Nelson,* Attorney General of Arizona.

Briefs of *amici curiae* were filed by *David A. Binder, Raine Eisler,* and *Paul L. McKaskle* for the Western Center on Law and Poverty et al., and by *William D. Browning* for the National Organization for Women.

MR. JUSTICE WHITE delivered the opinion of the Court.

This case raises an important issue concerning the construction of the Supremacy Clause of the Constitution—whether Ariz. Rev. Stat. Ann. § 28–1163 (B) (1956), which is part of Arizona's Motor Vehicle Safety Responsibility Act, is invalid under that clause as being in conflict with the mandate of § 17 of the Bankruptcy Act, 11 U. S. C. § 35, providing that receipt of a discharge in bankruptcy fully discharges all but certain specified judgments. The courts below, concluding that this case was controlled by *Kesler* v. *Department of Public Safety,* 369 U. S. 153 (1962), and *Reitz* v. *Mealey,* 314 U. S. 33 (1941), two earlier opinions of this Court dealing with alleged conflicts between the Bankruptcy Act and state financial responsibility laws, ruled against the claim of conflict and upheld the Arizona statute.

On July 8, 1965, petitioner Adolfo Perez, driving a car registered in his name, was involved in an automobile accident in Tucson, Arizona. The Perez automobile was not covered by liability insurance at the time of the collision. The driver of the second car was the minor daughter of Leonard Pinkerton, and in September 1966 the Pinkertons sued Mr. and Mrs. Perez in state court for personal injuries and property damage sustained in the accident. On October 31, 1967, the petitioners confessed judgment in this suit, and a judgment order was entered against them on November 8, 1967, for $2,425.98 plus court costs.

Mr. and Mrs. Perez each filed a voluntary petition in bankruptcy in Federal District Court on November 6, 1967. Each of them duly scheduled the judgment debt

to the Pinkertons. The District Court entered orders on July 8, 1968, discharging both Mr. and Mrs. Perez from all debts and claims provable against their estates, including the Pinkerton judgment. 11 U. S. C. § 35; *Lewis* v. *Roberts,* 267 U. S. 467 (1925).

During the pendency of the bankruptcy proceedings, the provisions of the Arizona Motor Vehicle Safety Responsibility Act came into play. Although only one provision of the Arizona Act is relevant to the issue presented by this case, it is appropriate to describe the statutory scheme in some detail. The Arizona statute is based on the Uniform Motor Vehicle Safety Responsibility Act promulgated by the National Conference on Street and Highway Safety.[1] Articles 1 and 2 of the Act deal, respectively, with definitional matters and administration.

The substantive provisions begin in Art. 3, which requires the posting of financial security by those involved in accidents. Section 28–1141 of that article requires suspension of licenses for unlawful failure to report accidents, and § 28–1142 (Supp. 1970–1971) provides that within 60 days of the receipt of an accident report the Superintendent of the Motor Vehicle Division of the Highway Department shall suspend the driver's license of the operator and the registration of the owner of a car involved in an accident "unless such operator or owner or both shall deposit security in a sum which is sufficient in the judgment of the superintendent to satisfy any judgment or judgments for damages resulting from the accident as may be recovered against the operator or owner." Under the same section, notice of such suspension and the amount of security required must be sent to the owner and operator not less than 10 days prior to the effective date of the suspension. This section does not apply if the owner or the operator carried liabil-

---

[1] See Reviser's Note, Ariz. Rev. Stat. Ann. § 28–1101.

ity insurance or some other covering bond at the time of the accident, or if such individual had previously qualified as a self-insurer under § 28–1222. Other exceptions to the requirement that security be posted are stated in § 28–1143.[2]  If none of these exceptions applies, the suspension continues until: (1) the person whose privileges were suspended deposits the security required under § 28–1142 (Supp. 1970–1971); (2) one year elapses from the date of the accident and the person whose privileges were suspended files proof with the Superintendent that no one has initiated an action for damages arising from the accident; (3) evidence is filed with the superintendent that a release from liability, an adjudication of nonliability, a confession of judgment, or some other written settlement agreement has been entered.[3]  As far as the record in the instant case shows,

---

[2] Under Ariz. Rev. Stat. Ann. § 28–1143 (A), the owner or operator of a car involved in an accident need not post security as required by § 28–1142 (Supp. 1970–1971): (1) if the accident caused injury or damage to no person or property other than the owner's car or the operator's person; (2) if the car was parked when involved in the accident, unless it was parked illegally or did not carry a legally sufficient complement of lights; (3) if the car was being driven or was parked by another without the owner's express or implied permission; (4) if prior to date for suspension the person whose license or registration would be suspended files with the superintendent a release, a final adjudication of nonliability, a confession of judgment, or some other written settlement agreement providing for payment, in installments, of an agreed amount of damages with respect to claims arising from the accident; or (5) if the driver at the time of the accident was driving a vehicle owned, operated, or leased by his employer with the employer's permission; in that case the security and suspension provisions apply only to the owner-employer's registration of vehicles not covered by insurance or other bond.

[3] This section further provides that the superintendent may employ suspension a second time as a means of enforcing payment should

the provisions of Art. 3 were not invoked against petitioners, and the constitutional validity of these provisions is, of course, not before us for decision.

Article 4 of the Arizona Act, which includes the only provision at issue here, deals with suspension of licenses and registrations for nonpayment of judgments. Interestingly, it is only when the judgment debtor in an automobile accident lawsuit—usually an owner-operator like Mr. Perez—fails to respond to a judgment entered against him that he must overcome two hurdles in order to regain his driving privileges. Section 28–1161, the first section of Art. 4, requires the state court clerk or judge, when a judgment[4] has remained unsatisfied for 60 days after entry, to forward a certified copy of the judgment to the superintendent.[5] This was done in the present case, and on March 13, 1968, Mr. and Mrs. Perez were served with notice that their drivers' licenses and registration were suspended pursuant to § 28–1162 (A).[6] Under other provisions of Art. 4, such suspension is to

there be a default on installment obligations arising under a confession of judgment or a written settlement agreement. Ariz. Rev. Stat. Ann § 28–1144 (3).

[4] Ariz. Rev. Stat. Ann § 28–1102 (Supp. 1970–1971) defines "judgment," for purposes of the Motor Vehicle Safety Responsibility Act, as "any judgment which has become final . . . , upon a cause of action arising out of the ownership, maintenance or use of a motor vehicle, for damages . . . or upon a cause of action on an agreement of settlement for such damages."

[5] Under Ariz. Rev. Stat. Ann. § 28–1161 (B), a similar notice must also be forwarded to officials in the home State of a nonresident judgment debtor.

[6] "A. The superintendent upon receipt of a certified copy of a judgment, shall forthwith suspend the license and registration and nonresident operating privilege of a person against whom the judgment was rendered, except as otherwise provided in this section and § 28–1165."

continue until the judgment is paid,[7] and § 28–1163 (B) specifically provides that "[a] discharge in bankruptcy following the rendering of any such judgment shall not relieve the judgment debtor from any of the requirements of this article." In addition to requiring satisfaction of the judgment debt, § 28–1163 (A) provides that the license and registration "shall remain suspended and shall not be renewed, nor shall any license or registration be thereafter issued in the name of the person . . . until the person gives proof of financial responsibility" for a future period.[8] Again, the validity of this limited requirement that some drivers post evidence of financial responsibility for the future in order to regain driving privileges is not questioned here. Nor is the broader issue of whether a

---

[7] Ariz. Rev. Stat. Ann. § 28–1163 (A). Ariz. Rev. Stat. Ann. § 28–1164 (Supp. 1970–1971) defines when a judgment is "paid." Ariz. Rev. Stat. Ann. § 28–1165 sets forth a procedure for paying judgments in installments. Ariz. Rev. Stat. Ann. § 28–1162 (B) provides that if a creditor consents in writing and the debtor furnishes proof of financial responsibility, see Ariz. Rev. Stat. Ann. § 28–1167, the debtor's license and registration may be restored in the superintendent's discretion. After six months, however, the creditor's consent is revocable provided the judgment debt remains unpaid.

[8] Sections 28–1167 through 28–1178 set forth the requirements for various forms of proof. Under § 28–1178, the judgment debtor is apparently able to regain his license and registration to operate a motor vehicle without proof of financial responsibility after three years from the date such proof was first required of him, if during that period the superintendent has not received any notice—and notice can come from other States—of a conviction or forfeiture of bail which would require or permit the suspension or revocation of the driver's license and if the individual is not involved in litigation arising from an accident covered by the security he posted. If the driver required to post financial security does so, and is involved as an owner or operator in another accident resulting in personal injury or property damage within one year prior to the date he requests permission to cancel his security, the superintendent may not permit cancellation.

State may require proof of financial responsibility as a precondition for granting driving privileges to anyone before us for decision. What is at issue here is the power of a State to include as part of this comprehensive enactment designed to secure compensation for automobile accident victims a section providing that a discharge in bankruptcy of the automobile accident tort judgment shall have no effect on the judgment debtor's obligation to repay the judgment creditor, at least insofar as such repayment may be enforced by the withholding of driving privileges by the State. It was that question, among others, which petitioners raised after suspension of their licenses and registration by filing a complaint in Federal District Court seeking declaratory and injunctive relief and requesting a three-judge court. They asserted several constitutional violations, and also alleged that § 28–1163 (B) was in direct conflict with the Bankruptcy Act and was thus violative of the Supremacy Clause of the Constitution.[9] In support of their complaint, Mr. and Mrs. Perez filed affidavits stating that the suspension of their licenses and registration worked both physical and financial hardship upon them and their children. The District Judge granted the petitioners leave to proceed *in forma pauperis,* but thereafter granted the respondents' motion to dismiss the complaint for failure to state a claim upon which relief could be granted, citing *Kesler* and *Reitz.*[10] The Court of Appeals affirmed, relying on

[9] U. S. Const., Art. VI, cl. 2.

[10] Mr. and Mrs. Perez also alleged in their complaint that certain provisions of the Arizona Act imposed involuntary servitude in violation of the Thirteenth Amendment, and denied Fourteenth Amendment due process and equal protection. They also claimed that portions of the Arizona Act operated as a bill of attainder in violation of Art. I, § 10, of the Constitution. The District Judge, in refusing to request the convening of a three-judge court, ruled that these constitutional claims were "obviously insubstantial." The Court of Appeals agreed. 421 F. 2d 619, 625 (CA9 1970). Because

the same two decisions. 421 F. 2d 619 (CA9 1970). We granted certiorari. 400 U. S. 818 (1970).

## I

Deciding whether a state statute is in conflict with a federal statute and hence invalid under the Supremacy Clause is essentially a two-step process of first ascertaining the construction of the two statutes and then determining the constitutional question whether they are in conflict. In the present case, both statutes have been authoritatively construed. In *Schecter* v. *Killingsworth,* 93 Ariz. 273, 380 P. 2d 136 (1963), the Supreme Court of Arizona held that "[t]he Financial Responsibility Act has for its principal purpose the protection of the public using the highways from financial hardship which may result from the use of automobiles by financially irresponsible persons." 93 Ariz., at 280, 380 P. 2d, at 140. The Arizona court has consistently adhered to this construction of its legislation, see *Camacho* v. *Gardner,* 104 Ariz. 555, 558, 456 P. 2d 925, 928 (1969); *New York Underwriters Ins. Co.* v. *Superior Court,* 104 Ariz. 544, 456 P. 2d 914 (1969); *Sandoval* v. *Chenoweth,* 102 Ariz. 241, 243, 428 P. 2d 98, 100 (1967); *Farmer* v. *Killingsworth,* 102 Ariz. 44, 47, 424 P. 2d 172, 175 (1967); *Hastings* v. *Thurston,* 100 Ariz. 302, 306, 413 P. 2d 767, 770 (1966); *Jenkins* v. *Mayflower Ins. Exchange,* 93 Ariz. 287, 290, 380 P. 2d 145, 147 (1963), and we are bound by its rulings. See, *e. g., General Trading Co.* v. *State Tax Comm'n,* 322 U. S. 335, 337 (1944). Although the dissent seems unwilling to accept the Arizona Supreme Court's construction of the statute as expressive of the Act's primary purpose [11]

of our resolution of this case, we express no opinion as to the substantiality of any of petitioners' other constitutional claims.

[11] As discussed below, the majorities in *Kesler* and *Reitz* also seemed unwilling to be bound by, or even to look for, state court constructions of the financial responsibility laws before them. See

and indeed characterizes that construction as unfortunate, *post,* at 667, a reading of the provisions outlined above leaves the impression that the Arizona Court's

---

*infra,* at 652–654. It is clear, however, from even a cursory examination of decisions in other States that the conclusion of the Arizona Supreme Court as to the purpose of the financial responsibility law is by no means unusual. See, *e. g., Sullivan* v. *Cheatham,* 264 Ala. 71, 76, 84 So. 2d 374, 378 (1955) ("The purpose of the [Motor Vehicle Safety-Responsibility] Act is clearly to require and establish financial responsibility for *every* owner or operator of a motor vehicle 'in any manner involved in an accident.'. . . The Act is designed to protect all persons having claims arising out of highway accidents."); *Escobedo* v. *State Dept. of Motor Vehicles,* 35 Cal. 2d 870, 876, 222 P. 2d 1, 5 (1950) ("[T]he state chose to allow financially irresponsible licensed operators to drive until they became involved in an accident with the consequences described in the [financial responsibility law] and their financial irresponsibility was thus brought to the attention of the department, and then to require suspension of their licenses."); *People* v. *Nothaus,* 147 Colo. 210, 215–216, 363 P. 2d 180, 183 (1961) ("The requirement of C. R. S. '53, 13–7–7, that the director of revenue, '. . . shall suspend the license of each operator and all registrations of each owner of a motor vehicle in any manner involved in [an] accident . . .' unless such persons deposit a sum 'sufficient in the judgment of the director . . .' to pay any damage which may be awarded, or otherwise show ability to indemnify the other party to the accident against financial loss, has nothing whatever to do with the protection of the public safety, health, morals or welfare. It is a device designated and intended to bring about the posting of security for the payment of a private obligation without the slightest indication that any legal obligation exists on the part of any person. The public gets no protection whatever from the deposit of such security. This is not the situation which we find in some states where the statutes require public liability insurance as a condition to be met *before a driver's license will issue.* Such statute protects the public. The statute before us is entirely different. In the matters to which we have particularly directed attention, C. R. S. '53, 13–7–7, is unconstitutional. On a matter so obviously basic and fundamental no additional citation of authority is required. We reach this conclusion notwithstanding the fact that other jurisdictions have seemingly overlooked basic constitutional guarantees which must be ignored in reaching an opposite conclu-

description of the statutory purpose is not only logical but persuasive. The sole emphasis in the Act is one of providing leverage for the collection of damages from

sion."); *Dempsey* v. *Tynan*, 143 Conn. 202, 208, 120 A. 2d 700, 703 (1956) ("The purpose of the legislature in enacting the financial responsibility provisions . . . was to keep off our highways the financially irresponsible owner or operator of an automobile who cannot respond in damages for the injuries he may inflict, and to require him, as a condition for securing or retaining a registration or an operator's license, to furnish adequate means of satisfying possible claims against him."); *City of St. Paul* v. *Hoffmann*, 223 Minn. 76, 77–78, 25 N. W. 2d 661, 662–663 (1946) ("The apparent objective of the safety responsibility act is to provide financial responsibility for injuries and damages suffered in motor vehicle traffic. It seeks to achieve its objective solely by the suspension of licenses. While its announced purpose is to promote safety of travel, its provisions take effect after an accident happens and subject drivers and owners of vehicles involved to suspension of their 'licenses' unless liability insurance coverage equivalent to that required by the act is carried by the owner or driver of the vehicle. . . . The purpose of the act was to effect financial responsibility to injured persons."); *Rosenblum* v. *Griffin*, 89 N. H. 314, 318, 197 A. 701, 704 (1938) ("Two reasons were thought to avail for sustaining such a law. One was its character as a regulation of the use of public highways and the other was its capacity to secure public safety in dangerous agencies and operations. This latter reason has slight if any evidence for its factual support. Certainly, in the absence of known experience and statistics, it is doubtful whether the insured owner's car, driven either by himself or another, may be considered to be operated more carefully than one whose owner is uninsured. But protection in securing redress for injured highway travelers is a proper subject of police regulation, as well as protection from being injured. It is a reasonable incident of the general welfare that financially irresponsible persons be denied the use of the highway with their cars, regardless of the competency of themselves or others as the drivers."). For legislative statements to the effect that financial responsibility laws are designed to secure compensation for injured victims, see, *e. g.,* Alaska Stat. § 28.20.010 (1970); *Gillaspie* v. *Department of Public Safety*, 152 Tex. 459, 463, 259 S. W. 2d 177, 180 (1953) (quoting emergency clause enacted by the Texas Legislature in connection with its financial responsibility

drivers who either admit that they are at fault or are adjudged negligent. The victim of another driver's carelessness, if he so desires, can exclude the superintendent entirely from the process of "deterring" a repetition of that driver's negligence.[12] Further, if an

law); S. Rep. No. 515, 83d Cong., 1st Sess., 2 (1953) (Report of the Senate Committee on the District of Columbia on the financial responsibility law proposed for the District).

[12] See *Reitz*, 314 U. S., at 40–43 (DOUGLAS, J., dissenting).

Under Art. 3 of the Arizona Act, dealing with the posting of security for damages arising from a particular accident, the victim may cut the superintendent out by executing a release from liability or agreeing to some other written settlement or confession of judgment providing for payment of some damages, in installments or otherwise. Ariz. Rev. Stat. Ann. § 28–1143 (A)(4) discussed in n. 2, *supra*. Assuming that such an agreement or confession of judgment providing for installment payments is filed with the superintendent, it prevents him from suspending driving privileges for failure to post the amount of financial security the superintendent determines to be necessary; however, if the careless driver later defaults on one installment, the victim may give notice to the superintendent, who must then use his power of suspension to either coerce full payment or the posting of security. Ariz. Rev. Stat. Ann. § 28–1144 (3), discussed in n. 3, *supra*.

Under Art. 4, dealing with suspension for nonpayment of a judgment, the victim who has chosen to reduce his claim to judgment maintains substantial control over the suspension of driving privileges if the judgment remains unsatisfied 60 days after entry. He may consent that the judgment debtor's driving privileges not be suspended, but the debtor still must furnish proof of financial responsibility for the future. Ariz. Rev. Stat. Ann. § 28–1162 (B). For an argument that a similar provision delegating to judgment creditors the right to choose which careless drivers who do not pay judgments shall escape suspension conflicts with the Bankruptcy Act see *Kesler*, 369 U. S., at 179–182 (Warren, C. J., dissenting). If the judgment debtor is able to secure a discretionary court order permitting him to pay a judgment in installments under § 28–1165 (A), the creditor may cause suspension of driving privileges until the judgment is fully satisfied by notifying the superintendent of any default in payment of the installments. Ariz. Rev.

accident is litigated and a special verdict that the defendant was negligent and the plaintiff contributorily negligent is entered, the result in Arizona, as in many other States, is that there is no liability for damages arising from the accident. *Heimke* v. *Munoz*, 106 Ariz. 26, 470 P. 2d 107 (1970); *McDowell* v. *Davis*, 104 Ariz. 69, 448 P. 2d 869 (1968). Under the Safety Responsibility Act, the apparent result of such a judgment is that no consequences are visited upon either driver although both have been found to have driven carelessly. See Ariz. Rev. Stat. Ann. §§ 28–1143 (A)(4), 28–1144 (3). Moreover, there are no provisions requiring drivers proved to be careless to stay off the roads for a period of time. Nor are there provisions requiring drivers who have caused accidents to attend some kind of driver improvement course, a technique that is not unfamiliar in sentencing for traffic offenses.

Turning to the federal statute, the construction of the Bankruptcy Act is similarly clear. This Court on numerous occasions has stated that "[o]ne of the primary purposes of the bankruptcy act" is to give debtors "a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preëxisting debt." *Local Loan Co.* v. *Hunt*, 292 U. S. 234, 244 (1934). Accord, *e. g., Harris* v. *Zion's Savings Bank & Trust Co.*, 317 U. S. 447, 451 (1943); *Stellwagen* v. *Clum*, 245 U. S. 605, 617 (1918); *Williams* v. *United States Fidelity & Guaranty Co.*, 236 U. S. 549, 554–555 (1915). There can be no doubt, given *Lewis* v. *Roberts*, 267 U. S. 467 (1925), that Congress intended this "new opportunity" to include freedom from most kinds of pre-existing tort judgments.

---

Stat. Ann. § 28–1165 (C). Again, however, the judgment debtor must still give proof of financial responsibility for the future. See Ariz. Rev. Stat. Ann. § 28–1165 (B).

## II

With the construction of both statutes clearly established, we proceed immediately to the constitutional question whether a state statute that protects judgment creditors from "financially irresponsible persons" is in conflict with a federal statute that gives discharged debtors a new start "unhampered by the pressure and discouragement of preëxisting debt." As early as *Gibbons* v. *Ogden,* 9 Wheat. 1 (1824), Chief Justice Marshall stated the governing principle—that "acts of the State Legislatures . . . [which] *interfere with,* or are contrary to the laws of Congress, made in pursuance of the constitution," are invalid under the Supremacy Clause. *Id.,* at 211 (emphasis added). Three decades ago MR. JUSTICE BLACK, after reviewing the precedents, wrote in a similar vein that, while "[t]his Court, in considering the validity of state laws in the light of treaties or federal laws touching the same subject, ha[d] made use of the following expressions: conflicting; contrary to; occupying the field; repugnance; difference; irreconcilability; inconsistency; violation; curtailment; and interference[,] . . . [i]n the final analysis," our function is to determine whether a challenged state statute "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines* v. *Davidowitz,* 312 U. S. 52, 67 (1941). Since *Hines* the Court has frequently adhered to this articulation of the meaning of the Supremacy Clause. See, *e. g., Nash* v. *Florida Industrial Comm'n,* 389 U. S. 235, 240 (1967); *Sears, Roebuck & Co.* v. *Stiffel Co.,* 376 U. S. 225, 229 (1964); *Colorado Anti-Discrimination Comm'n* v. *Continental Air Lines, Inc.,* 372 U. S. 714, 722 (1963) (dictum); *Free* v. *Bland,* 369 U. S. 663, 666 (1962); *Hill* v. *Florida,* 325 U. S. 538, 542–543 (1945); *Sola Electric Co.* v. *Jefferson Electric Co.,* 317 U. S. 173, 176 (1942). Indeed, in *Florida Lime &*

*Avocado Growers, Inc.* v. *Paul,* 373 U. S. 132 (1963), a recent case in which the Court was closely divided, all nine Justices accepted the *Hines* test. *Id.,* at 141 (opinion of the Court), 165 (dissenting opinion).

Both *Kesler*[13] and *Reitz,* however, ignored this controlling principle. The Court in *Kesler* conceded that Utah's financial responsibility law left "the bankrupt to some extent burdened by the discharged debt," 369 U. S., at 171, made "it more probable that the debt will be paid despite the discharge," *id.,* at 173, and thereby made "some inroad . . . on the consequences of bankruptcy . . . ." *Id.,* at 171. Utah's statute, in short, frustrated Congress' policy of giving discharged debtors a new start. But the *Kesler* majority was not concerned by this frustration. In upholding the statute, the majority opinion did not look to the effect of the legislation but simply asserted that the statute was "not an Act for the Relief of Mulcted Creditors," *id.,* at 174, and was "not designed to aid collection of debts but to enforce a policy against irresponsible driving . . . ." *Id.,* at 169. The majority, that is, looked to the purpose of the state legislation and upheld it because the purpose was not to circumvent the Bankruptcy Act but to promote highway safety; those in dissent, however, were concerned that, whatever the purpose of the Utah Act, its "plain and inevitable effect . . . [was] to create a powerful weapon for collection of a debt from which [the] bankrupt [had] been released by federal law." *Id.,* at 183. Such a result, they argued, left "the States free . . . to impair . . . an important and historic policy

---

[13] *Kesler* also decided a jurisdictional question, holding that a Supremacy Clause challenge to a state statute was required to be heard by a three-judge district court under 28 U. S. C. § 2281. See 369 U. S., at 155–158. This jurisdictional part of the decision was overruled almost four years later in *Swift & Co.* v. *Wickham,* 382 U. S. 111, 116 (1965).

of this Nation . . . embodied in its bankruptcy laws."
*Id.,* at 185.

The opinion of the Court in *Reitz* was similarly concerned, not with the fact that New York's financial responsibility law frustrated the operation of the Bankruptcy Act, but with the purpose of the law, which was divined as the promotion of highway safety. As the Court said:

> "The penalty which § 94–b imposes for injury due to careless driving is not for the protection of the creditor merely, but to enforce a public policy that irresponsible drivers shall not, with impunity, be allowed to injure their fellows. The scheme of the legislation would be frustrated if the reckless driver were permitted to escape its provisions by the simple expedient of voluntary bankruptcy, and, accordingly, the legislature declared that a discharge in bankruptcy should not interfere with the operation of the statute. Such legislation is not in derogation of the Bankruptcy Act. Rather it is an enforcement of permissible state policy touching highway safety." 314 U. S., at 37.

The dissenting opinion written by MR. JUSTICE DOUGLAS for himself and three others noted that the New York legislation put "the bankrupt . . . at the creditor's mercy," with the results that "[i]n practical effect the bankrupt may be in as bad, or even worse, a position than if the state had made it possible for a creditor to attach his future wages" and that "[b]ankruptcy . . . [was not] the sanctuary for hapless debtors which Congress intended." *Id.,* at 41.

We can no longer adhere to the aberrational doctrine of *Kesler* and *Reitz* that state law may frustrate the operation of federal law as long as the state legislature in passing its law had some purpose in mind other than

one of frustration.  Apart from the fact that it is at odds with the approach taken in nearly all our Supremacy Clause cases, such a doctrine would enable state legislatures to nullify nearly all unwanted federal legislation by simply publishing a legislative committee report articulating some state interest or policy—other than frustration of the federal objective—that would be tangentially furthered by the proposed state law.  In view of the consequences, we certainly would not apply the *Kesler* doctrine in all Supremacy Clause cases.  Although it is possible to argue that *Kesler* and *Reitz* are somehow confined to cases involving either bankruptcy or highway safety, analysis discloses no reason why the States should have broader power to nullify federal law in these fields than in others.  Thus, we conclude that *Kesler* and *Reitz* can have no authoritative effect to the extent they are inconsistent with the controlling principle that any state legislation which frustrates the full effectiveness of federal law is rendered invalid by the Supremacy Clause.  Section 28–1163 (B) thus may not stand.

### III

Even accepting the Supremacy Clause analysis of *Kesler* and *Reitz*—that is, looking to the purpose rather than the effect of state laws—those decisions are not dispositive of this case.  Just as *Kesler* went a step beyond *Reitz* and broadened the holding of the earlier case, 369 U. S., at 184 (dissenting opinion), so in the present case the respondents asked the courts below and this Court to expand the holdings of the two previous cases.  The distinction between *Kesler* and *Reitz* and this case lies in the State's expressed legislative purpose.

*Kesler* and *Reitz* were aberrational in their treatment of this question as well.  The majority opinions in both cases assumed, without citation of state court authority or any indication that such precedent was unavailable,

that the purpose of the state financial responsibility laws there under attack was not provision of relief to creditors but rather deterrence of irresponsible driving. The assumption was, in effect, that all state legislatures which had enacted provisions such as § 28–1163 (B) had concluded that an uninsured motorist about to embark in his car would be more careful on the road if he did not have available what the majority in *Kesler* cavalierly characterized as an "easy refuge in bankruptcy." 369 U. S., at 173.[14] Passing the question of whether the Court gave sufficient attention to binding state interpretations of state legislative purpose and conceding that it employed proper technique in divining as obvious from their face the aim of the state enactments, the present case raises doubts about whether the Court was correct even in its basic assumptions. The Arizona Supreme Court has declared that Arizona's Safety Responsibility Act "has for its principal purpose the protec-

---

[14] It also seems clear that even under the logic of *Kesler* and *Reitz* Mrs. Perez should not have lost her driving privileges. She was not present when the accident occurred, and no act or omission on her part contributed to it. Because the automobile was community property under Arizona law and because judgment was confessed as to her in the Pinkerton negligence action, the Court of Appeals reasoned that loss of Mrs. Perez' license "is the price an Arizona wife must pay for negligent driving by her husband of the community vehicle" when the resulting judgment is not paid. 421 F. 2d, at 624. The *Kesler* and *Reitz* assumption that depriving uninsured motorists of the full relief afforded by a discharge in bankruptcy would prompt careful driving is without foundation when applied to Mrs. Perez. As the Court of Appeals for the Third Circuit has stated in a recent decision involving similar facts:

"Even accepting the fiction that, as applied to drivers, motor vehicle responsibility statutes are intended to promote safety, it is just too much fiction to contend that, applied to a judgment debtor held vicariously liable for the omission of a sub-agent, the statute is anything but a means for the enforcement of judgments." *Miller* v. *Anckaitis*, 436 F. 2d 115, 118 (CA3 1970) (*en banc*).

tion of the public . . . from financial hardship" resulting from involvement in traffic accidents with uninsured motorists unable to respond to a judgment. *Schecter* v. *Killingsworth,* 93 Ariz., at 280, 380 P. 2d, at 140. The Court in *Kesler* was able to declare, although the source of support is unclear, that the Utah statute could be upheld because it was "not an Act for the Relief of Mulcted Creditors" or a statute "designed to aid collection of debts." 369 U. S., at 174, 169. But here the respondents urge us to uphold precisely the sort of statute that *Kesler* would have stricken down—one with a declared purpose to protect judgment creditors "from financial hardship" by giving them a powerful weapon with which to force bankrupts to pay their debts despite their discharge. Whereas the Acts in *Kesler* and *Reitz* had the effect of frustrating federal law but had, the Court said, no such purpose, the Arizona Act has both that effect and that purpose. Believing as we do that *Kesler* and *Reitz* are not in harmony with sound constitutional principle, they certainly should not be extended to cover this new and distinguishable case.

## IV

One final argument merits discussion. The dissent points out that the District of Columbia Code contains an anti-discharge provision similar to that included in the Arizona Act. Motor Vehicle Safety Responsibility Act of the District of Columbia, D. C. Code Ann. § 40–464 (1967), 68 Stat. 132. In light of our decision today, the sum of the argument is to draw into question the constitutional validity of the District's anti-discharge section, for as noted in the dissent the Constitution confers upon Congress the power "[t]o establish . . . *uniform* Laws on the subject of Bankruptcies throughout the United States." U. S. Const., Art. I, § 8, cl. 4 (emphasis

added). It is asserted that "Congress must have regarded the two statutes as consistent and compatible," *post*, at 665, but such an argument assumes a modicum of legislative attention to the question of consistency. The D. C. Code section does, of course, refer specifically to discharges, but its passage may at most be viewed as evidencing an opinion of Congress on the meaning of the general discharge provision enacted by an earlier Congress and interpreted by this Court as early as 1925. See *Lewis* v. *Roberts, supra.* In fact, in passing the initial and amended version of the District of Columbia financial responsibility law, Congress gave no attention to the interaction of the anti-discharge section with the Bankruptcy Act.[15] Moreover, the legislative history is

---

[15] See S. Rep. No. 10, 74th Cong., 1st Sess. (1935); H. R. Rep. No. 208, 74th Cong., 1st Sess. (1935) (both presenting a summary of the provisions of the proposed statute dealing with "Financial Responsibility of Motor Vehicle Operators in the District of Columbia," but failing to mention the fact that a discharge in bankruptcy of an accident judgment would have no effect on suspension of driving privileges for failure to satisfy such judgment); H. R. Conf. Rep. No. 799, 74th Cong., 1st Sess. (1935) (Conference Report making no mention of anti-discharge provision); 79 Cong. Rec. 272–273 (Senate); 79 Cong. Rec. 3416–3417, 4621–4629, 4631–4641, 6556–6564 (House). Some members of the House, which debated some aspects of the financial responsibility law concept rather extensively in 1935, demonstrated in debate that they were totally unaware of any of the provisions designed to enforce payment of a judgment for injuries caused by the first accident of a financially irresponsible driver. See 79 Cong. Rec. 4624 (remarks of Reps. Fitzpatrick and Sisson); *id.*, at 4625 (remarks of Rep. Hull).

When the present District of Columbia financial responsibility law was enacted in 1954, debate was much more limited and the reports of the House and Senate District Committees were quite brief. Except for the reading of the bill, no mention was made of the anti-discharge provision. See S. Rep. No. 515, 83d Cong., 1st Sess. (1953); H. R. Rep. No. 1448, 83d Cong., 2d Sess. (1954); 99 Cong. Rec. 8950–8951; 100 Cong. Rec. 6281–6287, 6347–6348.

quite clear that when Congress dealt with the subject of financial responsibility laws for the District, it based its work upon the efforts of the uniform commissioners which had won enactment in other States.[16]

Had Congress focused on the interaction between this minor subsection of the rather lengthy financial responsibility act and the discharge provision of the Bankruptcy Act, it would have been immediately apparent to the legislators that the only constitutional method for so defining the scope and effect of a discharge in bankruptcy was by amendment of the Bankruptcy Act, which by its terms is a uniform statute applicable in the States, Territories, and the District of Columbia. 11 U. S. C. § 1 (29). To follow any other course would obviously be to legislate in such a way that a discharge in bankruptcy means one thing in the District of Columbia and something else in the States—depending on state law—a result explicitly prohibited by the uniformity requirement in the constitutional authorization to Congress to enact bankruptcy legislation.

V

From the foregoing, we think it clear that § 28–1163 (B) of the Arizona Safety Responsibility Act is constitutionally invalid. The judgment of the Court of Appeals is reversed and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

---

[16] S. Rep. No. 10, 74th Cong., 1st Sess., 3 (1935); H. R. Rep. No. 208, 74th Cong., 1st Sess., 3 (1935); 79 Cong. Rec. 4626–4627 (remarks of Rep. Norton, chairman of the House District Committee). In reference to the present version of the financial responsibility act, see S. Rep. No. 515, 83d Cong., 1st Sess., 1 (1953); H. R. Rep. No. 1448, 83d Cong., 2d Sess., 2 (1954); 100 Cong. Rec. 6287 (remarks of Rep. Talle); *id.*, at 6347 (remarks of Sen. Beall).

MR. JUSTICE BLACKMUN, joined by THE CHIEF JUS-
TICE, MR. JUSTICE HARLAN, and MR. JUSTICE STEWART.

I concur in the result as to petitioner Emma Perez and
dissent as to petitioner Adolfo Perez.

## I

The slaughter on the highways of this Nation exceeds
the death toll of all our wars.[1] The country is frag-
mented about the current conflict in Southeast Asia, but
I detect little genuine public concern about what takes
place in our very midst and on our daily travel routes.
See *Tate* v. *Short,* 401 U. S. 395, 401 (1971) (concurring
opinion).

This being so, it is a matter of deep concern to me
that today the Court lightly brushes aside and overrules
two cases where it had upheld a representative attempt
by the States to regulate traffic and where the Court had
considered and rejected the very Supremacy Clause
argument that it now discovers to be so persuasive.[2]

## II

I think it is desirable to stress certain factual details.
The facts, of course, are only alleged, but for purposes
of the motion to dismiss, we are to accept them as true.
*Cooper* v. *Pate,* 378 U. S. 546 (1964).

Arizona is a community property state. Adolfo and
Emma Perez are husband and wife. They were resident
citizens of Arizona at the time of the accident in Tucson
in July 1965. Mr. Perez was driving an automobile reg-
istered in his name. He was alone. Mrs. Perez was not
with him and had nothing to do with her husband's

---

[1] See Appendix to this opinion, *post,* p. 672.

[2] The petitioners urge upon us only the Supremacy Clause.

operation of the car on that day. The automobile, however, was the property of the marital community.

Accompanying, and supposedly supportive of, the Perez complaint in the present suit, were affidavits of Mr. and Mrs. Perez. These affidavits asserted that the Perezes had four minor children ages 6 to 17; that Emma is a housewife and not otherwise gainfully employed; that Emma's inability to drive has required their two older children, aged 17 and 14, to walk one and a half miles to high school and the third child, aged 9, one mile to elementary school, with consequent nosebleeding; that Emma's inability to drive has caused inconvenience and financial injury; and that Adolfo's inability to drive has caused inconvenience because he must rely on others for transportation or use public facilities or walk.

## III

### The Statutory Plan

Arizona has a comprehensive statutory plan for the regulation of vehicles upon its highways. Ariz. Rev. Stat. Ann., Tit. 28. Among the State's efforts to assure responsibility in this area of increasing national concern are its Uniform Motor Vehicle Operators' and Chauffeurs' License Act (c. 4), its Uniform Act Regulating Traffic on Highways (c. 6), and its Uniform Motor Vehicle Safety Responsibility Act (c. 7).[3]

The challenged § 28–1163 (B) is a part of the Motor Vehicle Safety Responsibility Act. The Act's provisions are not unfamiliar. There is imposed upon the Motor

---

[3] In 1943 some of the motor vehicle uniform laws were "withdrawn from active promulgation pending further study" by the National Conference of Commissioners on Uniform State Laws. 9B U. L. A. Table III, xix, xxii, xxiii. See Mr. Justice Frankfurter's detailed review of the development of state legislation and of the uniform laws in this field in *Kesler* v. *Department of Public Safety,* 369 U. S. 153, 158–168 (1962).

Vehicle Division Superintendent the duty to suspend the license of each operator, and the registration of each owner, of a motor vehicle involved in an accident resulting in bodily injury or death or property damage to any one person in excess of $100, except, among other situations, where proof of financial responsibility, as by the deposit of appropriate security or by the presence of a liability policy of stated minimum coverage, is afforded. §§ 28–1142 (Supp. 1970–1971), 28–1143, and 28–1167. The suspension, once imposed, remains until the required security is deposited or until one year has elapsed and no action for damages has been instituted. § 28–1144. If the registrant or operator fails, within 60 days, to satisfy an adverse motor vehicle final judgment, as defined in § 28–1102 (2) (Supp. 1970–1971), the court clerk has the duty to notify the Superintendent and the latter to suspend the license and registration of the judgment debtor. §§ 28–1161 (A) and 28–1162 (A). But if the judgment creditor consents in writing that the debtor be allowed to retain his license and registration, the Superintendent in his discretion may grant that privilege. § 28–1162 (B). Otherwise the suspension remains in effect until the judgment is satisfied. § 28–1163 (A). Payments of stated amounts are deemed to satisfy the judgment, § 28–1164 (Supp. 1970–1971), and court-approved installment payment of the judgment will preserve the license and registration, § 28–1165.

## IV

### Adolfo Perez

Inasmuch as the case is before us on the motion of defendants below to dismiss the Perez complaint that alleged Adolfo's driving alone, the collision, and the judgment in favor of the Pinkertons, it is established, for present purposes, that the Pinkerton judgment was

based on Adolfo's negligence in driving the Perez vehicle.

Adolfo emphasizes, and I recognize, that under Art. I, § 8, cl. 4, of the Constitution, Congress has possessed the power to establish "uniform Laws on the subject of Bankruptcies throughout the United States"; that, of course, this power, when exercised, as it has been since 1800, is "exclusive," *New Lamp Chimney Co.* v. *Ansonia Brass & Copper Co.,* 91 U. S. 656, 661 (1876), and "unrestricted and paramount," *International Shoe Co.* v. *Pinkus,* 278 U. S. 261, 265 (1929); that one of the purposes of the Bankruptcy Act is to "relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh . . . ," *Williams* v. *United States Fidelity & Guaranty Co.,* 236 U. S. 549, 554–555 (1915); and that a bankrupt by his discharge receives "a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preëxisting debt," *Local Loan Co.* v. *Hunt,* 292 U. S. 234, 244 (1934).

From these general and accepted principles it is argued that § 28–1163 (B), with its insistence upon post-discharge payment as a condition for license and registration restoration, is violative of the Bankruptcy Act and, thus, of the Supremacy Clause.

As Mr. Perez acknowledges in his brief here, the argument is not new. It was raised with respect to a New York statute in *Reitz* v. *Mealey,* 314 U. S. 33 (1941), and was rejected there by a five-to-four vote:

> "The use of the public highways by motor vehicles, with its consequent dangers, renders the reasonableness and necessity of regulation apparent. The universal practice is to register ownership of automobiles and to license their drivers. Any appropriate means adopted by the states to insure competence and care on the part of its licensees

and to protect others using the highway is consonant with due process. . . .

.        .        .        .        .

"The penalty which § 94-b imposes for injury due to careless driving is not for the protection of the creditor merely, but to enforce a public policy that irresponsible drivers shall not, with impunity, be allowed to injure their fellows. The scheme of the legislation would be frustrated if the reckless driver were permitted to escape its provisions by the simple expedient of voluntary bankruptcy, and, accordingly, the legislature declared that a discharge in bankruptcy should not interfere with the operation of the statute. Such legislation is not in derogation of the Bankruptcy Act. Rather it is an enforcement of permissible state policy touching highway safety." 314 U. S., at 36–37.

Left specifically unanswered in that case, but acknowledged as a "serious question," 314 U. S., at 38, was the claim that interim amendments of the statutes gave the creditor control over the initiation and duration of the suspension and thus violated the Bankruptcy Act. The dissenters, speaking through MR. JUSTICE DOUGLAS, concluded that that constitutional issue "cannot be escaped . . . unless we are to overlook the realities of collection methods." 314 U. S., at 43.

Nine years ago, the same argument again was advanced, this time with respect to Utah's Motor Vehicle Safety Responsibility Act, and again was rejected. *Kesler* v. *Department of Public Safety,* 369 U. S. 153, 158–174 (1962). There, Utah's provisions relating to duration of suspension and restoration, more stringent than those of New York, were challenged. It was claimed that the statutes made the State a "collecting agent for the creditor rather than furthering an interest in highway safety,"

and that suspension that could be perpetual "only renders the collection pressure more effective." 369 U. S., at 169. There was a troublesome jurisdictional issue in the case, the decision as to which was later overruled, *Swift & Co.* v. *Wickham,* 382 U. S. 111, 124–129 (1965), but on the merits the Court, by a five-to-three vote, sustained all the Utah statutes then under attack: [4]

> "But the lesson *Zavelo* [v. *Reeves,* 227 U. S. 625 (1913)] and *Spalding* [v. *New York ex rel. Backus,* 4 How. 21 (1845)] teach is that the Bankruptcy Act does not forbid a State to attach any consequence whatsoever to a debt which has been discharged.
>
> "The Utah Safety Responsibility Act leaves the bankrupt to some extent burdened by the discharged debt. Certainly some inroad is made on the consequences of bankruptcy if the creditor can exert pressure to recoup a discharged debt, or part of it, through the leverage of the State's licensing and registration power. But the exercise of this power is deemed vital to the State's well-being, and, from the point of view of its interests, is wholly unrelated to the considerations which propelled Congress to enact a national bankruptcy law. There are here overlapping interests which cannot be uncritically resolved by exclusive regard to the money consequences of enforcing a widely adopted measure for safeguarding life and safety.
>
> ". . . At the heart of the matter are the complicated demands of our federalism.
>
> "Are the differences between the Utah statute and

---

[4] Mr. Chief Justice Warren, dissenting in part, would have upheld the Utah statutes other than that "which gives to a creditor the discretion of determining if and when driving privileges may be restored by the State . . . ." 369 U. S., at 179–182.

that of New York so significant as to make a constitutionally decisive difference? A State may properly decide, as forty-five have done, that the prospect of a judgment that must be paid in order to regain driving privileges serves as a substantial deterrent to unsafe driving. We held in *Reitz* that it might impose this requirement despite a discharge, in order not to exempt some drivers from appropriate protection of public safety by easy refuge in bankruptcy. . . . To whatever extent these provisions make it more probable that the debt will be paid despite the discharge, each no less reflects the State's important deterrent interest. Congress had no thought of amending the Bankruptcy Act when it adopted this law for the District of Columbia; we do not believe Utah's identical statute conflicts with it either.

"Utah is not using its police power as a devious collecting agency under the pressure of organized creditors. Victims of careless car drivers are a wholly diffused group of shifting and uncertain composition, not even remotely united by a common financial interest. The Safety Responsibility Act is not an Act for the Relief of Mulcted Creditors. It is not directed to bankrupts as such. Though in a particular case a discharged bankrupt who wants to have his rightfully suspended license and registration restored may have to pay the amount of a discharged debt, or part of it, the bearing of the statute on the purposes served by bankruptcy legislation is essentially tangential." 369 U. S., at 170–174 (footnotes omitted).

MR. JUSTICE BLACK, joined by MR. JUSTICE DOUGLAS, dissented on the ground that Utah Code Ann. § 41–12–15 (1953), essentially identical to Arizona's § 28–1163 (B),

operated to deny the judgment debtor the federal immunity given him by § 17 of the Bankruptcy Act and, hence, violated the Supremacy Clause. 369 U. S., at 182–185.

The Perezes in their brief, p. 7, acknowledge that the Arizona statutes challenged here "are not unlike the Utah ones discussed in *Kesler*." Accordingly, Adolfo Perez is forced to urge that *Reitz* and the remaining portion of *Kesler* that bears upon the subject be overruled. The Court bows to that argument.

I am not prepared to overrule those two cases and to undermine their control over Adolfo Perez' posture here. I would adhere to the rulings and I would hold that the States have an appropriate and legitimate concern with highway safety; that the means Arizona has adopted with respect to one in Adolfo's position (that is, the driver whose negligence has caused harm to others and whose judgment debt based on that negligence remains unsatisfied) in its attempt to assure driving competence and care on the part of its licensees, as well as to protect others, is appropriate state legislation; and that the Arizona statute, like its Utah counterpart, despite the tangential effect upon bankruptcy, does not operate in derogation of the Bankruptcy Act or conflict with it to the extent it may rightly be said to violate the Supremacy Clause.

Other factors of significance are also to be noted:

1. The Court struggles to explain away the parallel District of Columbia situation installed by Congress itself. Section 40–464 of the D. C. Code Ann. (1967) in all pertinent parts is identical with Arizona's § 28–1163 (B). The only difference is in the final word, namely, "article" in the Arizona statute and "chapter" in the District's. The District of Columbia statute was enacted as § 48 of Pub. Law 365 of May 25, 1954, effective one year later, 68 Stat. 132. This is long after the Bankruptcy Act

was placed on the books and, indeed, long after this Court's decision in *Lewis* v. *Roberts,* 267 U. S. 467 (1925), that a personal injury judgment is a provable claim in bankruptcy. Surely, as the Court noted in *Kesler,* 369 U. S., at 173–174, "Congress had no thought of amending the Bankruptcy Act when it adopted this law for the District of Columbia." See *Lee* v. *England,* 206 F. Supp. 957 (DC 1962). Congress must have regarded the two statutes as consistent and compatible, and cannot have thought otherwise for the last 35 years.[5] If the statutes truly are in tension, then I would suppose that the later one, that is, § 40–464, would be the one to prevail. *Gibson* v. *United States,* 194 U. S. 182, 192 (1904). But, if so, we then have something less than the "uniform Laws on the subject of Bankruptcies throughout the United States" that Art. I, § 8, cl. 4, of the Constitution commands, for the law would be one way in Arizona (and, by the present overruling of *Reitz* and *Kesler,* in New York and in Utah) and the other way in the District of Columbia. Unfortunately, such is the dilemma in which the Court's decision today leaves us.

2. Arizona's § 28–1163 (B) also has its counterparts in the statutes of no less than 44 other States.[6] It is, after

---

[5] Public Law 365 replaced the Act of May 3, 1935, 49 Stat. 166, known as the Owners' Financial Responsibility Act of the District of Columbia. Section 3 of the earlier Act provided, 49 Stat. 167, that a judgment's discharge in bankruptcy, as distinguished from other discharge, would not relieve the judgment debtor from suspension.

[6] Ala. Code, Tit. 36, § 74 (55) (Supp. 1969); Alaska Stat. § 28.20.350 (1962); Ark. Stat. Ann. § 75–1457 (1957); Cal. Vehicle Code § 16372 (1960); Colo. Rev. Stat. Ann. § 13–7–25 (2) (Supp. 1965); Conn. Gen. Stat. Rev. § 14–131 (1966); Del. Code Ann., Tit. 21, § 2943 (1953); Hawaii Rev. Stat. § 287–17 (1968); Idaho Code § 49–1514 (1967); Ill. Ann. Stat., c. 95 1/2, § 7–310 (1971); Iowa Code § 321A.14 (2) (1971); Kan. Stat. Ann. § 8–744 (b) (1964); Ky. Rev. Stat. § 187.420 (1962); La. Rev. Stat. Ann.

all, or purports to be, a *uniform* Act. I suspect the Court's decision today will astonish those members of the Congress who were responsible for the District of Columbia Code provision, and will equally astonish the legislatures of those 44 States that absorbed assurance from *Reitz* and *Kesler* that the provision withstands constitutional attack.

3. The Court rationalizes today's decision by saying that *Kesler* went beyond *Reitz* and that the present case goes beyond *Kesler,* and that that is too much. It would justify this by noting the Arizona Supreme Court's characterization of the Arizona statute as one for the protection of the public from financial hardship and by con-

---

§ 32:893 (1963); Me. Rev. Stat. Ann., Tit. 29, § 783 (6) (1964) (10 years); Md. Ann. Code, Art. 66 1/2, § 7–315 (1970); Mich. Comp. Laws § 257.513 (b) (Supp. 1956); Minn. Stat. § 170.33, subd. 5 (1967); Miss. Code Ann. § 8285–14 (b) (1942); Mo. Rev. Stat. § 303.110 (1959); Mont. Rev. Codes Ann. § 53–431 (1961); Neb. Rev. Stat. § 60–519 (1968); Nev. Rev. Stat. § 485.303 (1968); N. H. Rev. Stat. Ann. § 268:9 (1966); N. J. Stat. Ann. § 39:6–35 (Supp. 1971); N. M. Stat. Ann. § 64–24–78 (1960); N. Y. Veh. & Traf. Law § 337 (c) (1970); N. C. Gen. Stat. § 20–279.14 (Supp. 1969); N. D. Cent. Code § 39–16.1–04 (5) (Supp. 1969); Ohio Rev. Code Ann. § 4509.43 (Supp. 1970); Okla. Stat. Ann., Tit. 47, § 7–315 (1962); Pa. Stat. Ann., Tit. 75, § 1414 (1960); R. I. Gen. Laws Ann. § 31–32–15 (1969); S. C. Code Ann. § 46–748 (Supp. 1960); S. D. Comp. Laws Ann. § 32–35–58 (1967); Tenn. Code Ann. § 59–1236 (1968); Tex. Rev. Civ. Stat. Ann., Art. 6701h, § 14 (b) (1969); Utah Code Ann. § 41–12–15 (1953); Vt. Stat. Ann., Tit. 23, § 802 (b) (1967); Va. Code Ann. § 46.1–444 (a) (4) (Supp. 1970) (15 years); Wash. Rev. Code Ann. § 46.29.380 (1967); W. Va. Code Ann. § 17D–4–6 (1966); Wis. Stat. § 344.26 (2) (1967) [cf. *Zywicke v. Brogli,* 24 Wis. 2d 685, 130 N. W. 2d 180 (1964)]; Wyo. Stat. Ann. § 31–299 (1967).

See also Fla. Stat. Ann. § 324.131 (1968) and Op. Atty. Gen. 059–200 (1959); Ga. Code Ann. § 92A–605 (e) (3) (Supp. 1970); Ind. Ann. Stat. § 47–1049 (1965) and Op. Atty. Gen. 1936, p. 272; Mass. Gen. Laws Ann., c. 90, § 22A (Supp. 1971); Ore. Rev. Stat. § 486.211 (5) (1967).

cluding, from this description, that the statute is not a public highway safety measure, but rather a financial one protective, I assume the implication is, of insurance companies. The Arizona court's characterization of its statute, I must concede, is not a fortunate one. However, I doubt that that court, in evolving that description, had any idea of the consequences to be wrought by this Court's decision today. I am not willing to say that the description in *Schecter* v. *Killingsworth,* 93 Ariz. 273, 380 P. 2d 136 (1963), embraced the only purpose of the State's legislation. Section 28–1163 (B) is a part of the State's Motor Vehicle *Safety* Responsibility Act and does not constitute an isolated subchapter of that Act concerned only with financial well-being of the victims of drivers' negligence. In any event, as the Court's opinion makes clear, the decision today would be the same however the Arizona court had described its statute.

4. While *stare decisis* "is no immutable principle," [7] as a glance at the Court's decisions over the last 35 years, or over almost any period for that matter, will disclose, it seems to me that the principle does have particular validity and application in a situation such as the one confronting the Court in this case. Here is a statute concerning motor vehicle responsibility, a substantive matter peculiarly within the competence of the State rather than the National Government. Here is a serious and conscientious attempt by a State to legislate and do something about the problem that, in terms of death and bodily injury and adverse civilian effect, is so alarming. Here is a statute widely adopted by the several States and legitimately assumed by the lawmakers of those States to be consistent with the Bankruptcy Act, an assumption rooted in positive, albeit divided, decision

---

[7] MR. JUSTICE DOUGLAS, dissenting, in *Swift & Co.* v. *Wickham,* 382 U. S., at 133.

by this Court, not once, but twice. And here is a statute the Congress itself, the very author of the Bankruptcy Act, obviously considered consistent therewith. I fear that the Court today makes *stare decisis* meaningless and downgrades it to the level of a tool to be used or cast aside as convenience dictates. I doubt if Justices Roberts, Stone, Reed, Frankfurter, Murphy, Warren, Clark, HARLAN, BRENNAN, and STEWART, who constituted the respective majorities on the merits in *Reitz* and *Kesler,* were all that wrong.

5. Adolfo's affidavit protestation of hardship goes no further than to assert a resulting reliance upon friends and neighbors or upon public transportation or upon walking to cover the seven miles from his home to his place of work; this is inconvenience, perhaps, even in this modern day when we are inclined to equate convenience with necessity and to eschew what prior generations routinely accepted as part of the day's labor, but it falls far short of the "great harm" and "irreparable injury" that he otherwise asserts only in general and conclusory terms. Perez' professed inconvenience stands vividly and starkly in contrast with his victims' injuries. But as is so often the case, the victim, once damaged, is seemingly beyond concern. What seems to become important is the perpetrator's inconvenience.

6. It is conceded that Arizona constitutionally could prescribe liability insurance as a condition precedent to the issuance of a license and registration.

## V

### Emma Perez

Emma Perez' posture is entirely different. Except for possible emotional strain resulting from her husband's predicament, she was in no way involved in the Pinkerton accident. She was not present when it occurred and no negligence or nonfeasance on her part contributed to it.

Emma thus finds herself in a position where, having done no wrong, she nevertheless is deprived of her operator's license. This comes about because the Perez vehicle concededly was community property under § 25-211 (A), and because, for some reason, the judgment was confessed as to her as well as against her husband. As one *amicus* brief describes it, Emma, a fault-free driver, "is without her license solely because she is the impecunious wife of an impecunious, negligent driver in a community property state."

At this point a glance at the Arizona community property system perhaps is indicated. Emma Perez was a proper nominal defendant in the Pinkerton lawsuit, see *Donato* v. *Fishburn,* 90 Ariz. 210, 367 P. 2d 245 (1961), but she was not a necessary party there. *First National Bank* v. *Reeves,* 27 Ariz. 508, 517, 234 P. 556, 560 (1925); *Bristol* v. *Moser,* 55 Ariz. 185, 190–191, 99 P. 2d 706, 709 (1940). However, a judgment against a marital community based upon the husband's tort committed without the wife's knowledge or consent does not bind her separate property. *Ruth* v. *Rhodes,* 66 Ariz. 129, 138, 185 P. 2d 304, 310 (1947). The judgment would, of course, bind the community property vehicle to the extent permitted by Arizona law. See § 33-1124.

In Arizona during coverture personal property may be disposed of only by the husband. § 25-211 (B). The community personalty is subject to the husband's dominance in management and control. *Mortensen* v. *Knight,* 81 Ariz. 325, 334, 305 P. 2d 463, 469 (1956). The wife has no power to make contracts binding the common property. § 25-214 (A). Her power to contract is limited to necessaries for herself and the children. § 25-215. Thus, as the parties appear to agree, she could neither enter into a contract for the purchase of an automobile nor acquire insurance upon it except by use of her separate property.

The Court of Appeals ruled that Mrs. Perez' posture, as the innocent wife who had no connection with the negligent conduct that led to the confession and entry of judgment, was, under the logic of *Kesler* and *Reitz,* "a distinction without a significant difference" even though "she had no alternative." 421 F. 2d 619, 622–623. The court opined that the spouse can acquire an automobile with her separate funds and that negligent operation of it on separate business would then not call into question the liability of the other spouse. It described Emma's legal status as "closely analogous" to that of the automobile owner who permits another person to drive, and it regarded as authority cases upholding a State's right to revoke the owner's license and registration after judgment had been entered against him and remains unsatisfied. The husband was described, under Arizona law, as the managing agent of the wife in the control of the community automobile, and "the driver's licenses of both husband and wife are an integral part of the ball of wax, which is the basis of the Arizona community property laws." The loss of her license "is the price an Arizona wife must pay for negligent driving by her husband of the community vehicle" when the resulting judgment is not paid. 421 F. 2d, at 624.

For what it is worth, Emma's affidavit is far more persuasive of hardship than Adolfo's. She relates the family automobile to the children and their medical needs and to family purchasing at distant discount stores. But I need not, and would not, decide her case on the representations in her affidavit.

I conclude that the reasoning of the Court of Appeals, in its application to Emma Perez and her operator's license, does not comport with the purpose and policy of the Bankruptcy Act and that it effects a result at odds with the Supremacy Clause. Emma's subordinate

position with respect to the community's personal property, and her complete lack of connection with the Pinkerton accident and with the negligence that occasioned it, are strange accompaniments for the deprival of her operator's license. The nexus to the state police power, claimed to exist because of her marriage to the negligent Adolfo and the community property character of the accident vehicle, is, for me, elusive and unconvincing. The argument based on Arizona's appropriate concern with highway safety, that prompts me to adhere to the *Reitz-Kesler* rationale for Adolfo, is drained of all force and persuasion when applied to the innocent Emma. Despite the underlying community property legal theory, Emma had an incident of ownership in the family automobile only because it was acquired during coverture. She had no "control" over Adolfo's use of the vehicle and she could not forbid his use as she might have been able to do were it her separate property. Thus, the state purpose in deterring the reckless driver and his unsafe driving has only undeserved punitive application to Emma. She is personally penalized not only with respect to the operation of the Perez car but also with respect to any automobile.

I therefore would hold that under these circumstances the State's action, under § 28–1163 (B), in withholding from Emma her operator's license is not, within the language of *Reitz,* an appropriate means for Arizona "to insure competence and care on the part of [Emma] and to protect others" using the highways, 314 U. S., at 36, and that it interferes with the paramount federal interest in her bankruptcy discharge and violates the Supremacy Clause.

[For Appendix to opinion of BLACKMUN, J., see *post,* p. 672.]

## APPENDIX TO OPINION OF BLACKMUN, J.

### MOTOR-VEHICLE DEATHS AND WAR DEATHS

From 1900 through 1969, motor-vehicle deaths in the U. S. totalled nearly 1,800,000. Deaths of U. S. military personnel in all wars are shown below. In making comparisons, it must be kept in mind that nearly everyone is exposed to motor-vehicle accidents but relatively few are exposed to war deaths.

U. S. MILITARY CASUALTIES IN PRINCIPAL WARS

| War | Total | Deaths Battle | Others* | Nonfatal Wounds |
|---|---|---|---|---|
| Total ................... | †1,146,000 | 643,052 | †503,200 | $1,540,000 |
| Revolutionary War (1775–83).... | 4,435 | 4,435 | N.A. | 6,188 |
| War of 1812 (1812–15)........ | 2,260 | 2,260 | N.A. | 4,505 |
| Mexican War (1846–48)....... | 13,283 | 1,733 | 11,550 | 4,152 |
| Civil War (1861–65) | | | | |
| Union Forces............. | 364,511 | 140,414 | 224,097 | 281,881 |
| Confederate Forces.......... | 133,821 | 74,524 | 59,297 | N.A. |
| Spanish-American War (1898).... | 2,446 | 385 | 2,061 | 1,662 |
| World War I (1917–18)....... | 116,708 | 53,513 | 63,195 | 204,002 |
| World War II (1941–45)....... | 407,316 | 292,131 | 115,185 | 670,846 |
| Korean War (1950–53)........ | 54,246 | 33,629 | 20,617 | 103,284 |
| Viet Nam War (1961–69)...... | 47,251 | 40,028 | 7,223 | 262,799 |

Source: Office of Secretary of Defense.    *Includes deaths from disease, accidents, etc.
†Rounded.    §Incomplete and rounded. N. A. Not available.
Accident Facts 63, published by the National Safety Council (1970 ed.).

The same publication, page 59, discloses that the annual death toll for motor vehicle accidents in the United States has exceeded 52,000 in each of the last five calendar years. Thus, the *annual* motor vehicle carnage approximates the *total* number of lives lost during the entire Vietnam conflict beginning in 1961.