MOBIL OIL CORP. et al.

v.

Orest T. DUBNO et al.

TEXACO, INC.,

v.

Carl R. AJELLO et al.

AMERADA HESS CORP.

v.

Ella T. GRASSO et al.

Civ. Nos. H–80–359, H–80–376 and H–80–377.

United States District Court, D. Connecticut.

July 9, 1980.

Richard M. Reynolds, William E. Glynn, Allan B. Taylor, Day, Berry & Howard, Hartford, Conn., for plaintiffs in No. H–80–359.

Robert L. Klein, Paul M. Scimonelli, Ralph G. Murphy, Asst. Attys. Gen., Hartford, Conn., for defendants in all cases.

Francis J. McNamara, Jr., Eric Watt Wiechmann, Cummings & Lockwood, Stamford, Conn., for plaintiffs in No. H–80–376.

Arthur Sachs, Sonja Goldstein, Sachs, Sachs, Delaney & Sachs, Milford, Conn., Robert H. Elliott, Myron C. Baum, Albert G. Lauber, Jr., Caplin & Drysdale, Washington, D. C., for plaintiffs in No. H–80–377.

## MEMORANDUM OF DECISION

BLUMENFELD, Senior District Judge.

The plaintiffs, in their respective complaints in these three actions, seek declaratory and injunctive relief against the implementation or enforcement of section 13(b) of Public Act 80–71 of the State of Connecticut.[1] A hearing on the plaintiffs' motion for a preliminary injunction was conducted on June 23, 1980. A hearing on the merits was held on June 30, 1980. The cases are thus ripe for final decision.

## I. BACKGROUND

### A. The Connecticut Statute

Section 1 of Public Act 80–71 of the 1980 Connecticut General Assembly ("the Act") singles out a narrow group of companies and imposes a two-percent tax on the gross receipts of those companies from their sales

---

1. The sections of P.A. 80–71 that are relevant to this action are reproduced in an Appendix to this opinion.

in Connecticut. Only a company that is engaged primarily in the *refining and distribution* of *petroleum* products and that distributes such products to wholesale and retail dealers for marketing and distribution in Connecticut must pay the tax. Since there are no petroleum refineries in Connecticut, the restrictions on the application of the tax contained in section 1 effectively limit the tax to integrated petroleum companies engaged in both the refining and distribution of petroleum products in a number of states. In contrast, companies that only distribute petroleum products are not taxed on their receipts from sales in Connecticut.

In the ordinary course of business, the cost of a tax such as the gross receipts tax would be passed along to purchasers in the form of higher prices. In order to avoid the predictable application of the tax burden to Connecticut purchasers, the General Assembly enacted section 13 of the Act.

Section 13(a) contains a general statement of legislative intent: "It is . . . the intention of the general assembly that the tax imposed under section 1 of this act be construed as a tax upon . . . and be collectible from petroleum companies as defined in said section 1, and that such tax shall constitute a part of the operating overhead of such companies." Section 13(a) itself contains no provision respecting the price of petroleum products.

Implementing the intent to have the gross receipts tax treated as an overhead cost, section 13(b) forbids each company subject to the tax to raise its wholesale prices in Connecticut by any amount higher than the average amount by which it raises such prices "in all ports on the eastern coast of the United States." Because of section 13(b), such costs may not be added entirely to prices in Connecticut, but may be recouped only on a pro rata basis from all customers in the states (including Connecticut) to which petroleum products are distributed from east coast ports.

The pricing provisions of section 13(b) apply only to petroleum products "exempt from the federal Emergency Petroleum Allocation Act (P.L. 93–159) ['EPAA']." At the present time, these so-called exempt products include home heating oil, diesel fuel, residual fuel oil, automotive motor oil, industrial oil and greases, and aviation fuel.

The plaintiffs in these three actions are petroleum companies subject to the tax imposed by section 1 of the Act and therefore to the pricing provisions of section 13(b). They will be required by sections 1 and 7 of the Act to file quarterly returns and payments of the tax, which the state anticipates will total approximately $60 million in the next year. This court is not asked to decide whether the imposition of the tax is valid. The companies concede that it is and have indicated their intention to pay that tax when due. They challenge only section 13(b), which restricts their ability to pass through the entire cost of the tax to Connecticut purchasers. Pursuant to section 30 of the Act, section 13(b) became effective on July 1, 1980.

The plaintiffs contend that Connecticut's action is barred by reason of provisions in the federal Constitution and laws. Their primary argument is that section 13(b) is pre-empted by federal regulation and thus cannot stand under the Supremacy Clause of the Constitution.[2] U.S.Const., art. VI, cl. 2. Analysis of this contention requires examination of the federal statutory and regulatory scheme on which the plaintiffs rely, a task to which we now briefly turn.

### B. The Federal System for the Pricing of Petroleum Products

When Congress enacted the EPAA, it found that shortages of various petroleum products "constitute[d] a national energy crisis" requiring action by the federal government. 15 U.S.C. § 751(a)(3). To alleviate this crisis in the "national distribution system" for such products, *id.* § 751(b),

2. Additionally, the plaintiffs argue that section 13(b) unduly burdens interstate commerce in violation of the Commerce Clause, U.S.Const.,

art. I, § 8, cl. 3, and that it violates the Due Process Clause of the fourteenth amendment.

the Congress authorized the President to promulgate regulations governing the allocation and pricing of crude oil, residual fuel oil, gasoline, kerosene, distillates, LPG, refined lubricating oils, and diesel fuel throughout the United States. *Id.* 753(a).[3] The Congress specifically instructed the President to keep in view the national scope of the subject to be regulated, requiring that his regulations should provide, to the maximum extent practicable, for the "equitable distribution of crude oil, residual fuel oil, and refined petroleum products at *equitable prices among all regions and areas of the United States. . ."* *Id.* § 753(b)(1)(F) (emphasis added).[4]

The understanding of Congress that the allocation and pricing of petroleum products is a national problem requiring federal regulation is reflected also in the legislative history of the EPAA. When Senator Henry Jackson, sponsor of Senate Bill 1570, first introduced the bill on April 13, 1973, he underscored the importance of Congress' actions "to build a coordinated and rational fuels and energy policy." 119 Cong.Rec. 12317, *quoted in* S.Rep. No. 93–159, 93d Cong., 1st Sess. 21 (1973). Later, Senator Jackson as floor manager of the bill during the Senate debates urged that one of the reasons that Congress should enact mandatory rather than voluntary measures to address the fuel supply problem was to avoid piecemeal action by the states:

> "Further, if the Federal Government fails to establish effective regional or national allocation plans, we will invite piecemeal action by the States. Our fuel shortage problems are national problems; they

must be recognized and resolved at the Federal level."

119 Cong.Rec. 17764 (1973).

In response to the EPAA the President, acting through a series of executive agencies now submerged in the Department of Energy ("DOE"), has promulgated a comprehensive system of regulations governing the allocation and pricing of petroleum products. *See* 10 C.F.R. Parts 210–212. Regulations pursuant to the EPAA were originally issued on December 27, 1973, 39 Fed.Reg. 744 (1974), and were shortly thereafter comprehensively reorganized and revised, 39 Fed.Reg. 1924 (1974). On January 10, 1975, in clarifying its definition of "covered products" which were subject to price regulation under the EPAA, the Federal Energy Administration ("FEA") emphasized its intention to regulate to the full extent of the authority granted under the Act:

> "With respect to 'covered products' (i. e. those products which are subject to FEA price regulations) the intent of the FEO [Federal Energy Office], and now the FEA, has always been to exercise its regulatory authority under the [EPAA] with respect to all products that are subject to that Act. Previous definitions of 'covered products' as set forth in the Mandatory Petroleum Price Regulations were in no way intended to restrict the scope of the price regulations to anything less than all the products subject to the [EPAA]."

40 Fed.Reg. 2795 (1975).[5] Accordingly, as of that date "covered products" subject to

---

**3.** Title 15 U.S.C. § 753(a) provides:

"Not later than fifteen days after November 27, 1973, the President shall promulgate a regulation providing for the mandatory allocation of crude oil, residual fuel oil, and each refined petroleum product, in amounts specified in (or determined in a manner prescribed by) and at prices specified in (or determined in a manner prescribed by) such regulation. Subject to subsection (d) of this section, such regulation shall take effect not later than fifteen days after its promulgation. Such regulation shall apply to all crude oil, residual fuel oil, and refined petroleum products

produced in or imported into the United States."

**4.** In addition, the President was required to provide, to the maximum extent practicable, for the "minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms." 15 U.S.C. § 753(b)(1)(I).

**5.** "The interpretation of the agency charged with administration of the statute is, of course, entitled to substantial deference." *Quern v. Mandley,* 436 U.S. 725, 738, 98 S.Ct. 2068, 2076, 56 L.Ed.2d 658 (1978) (citing *New York State Department of Social Services v. Dublino,*

price regulation under the EPAA included crude oil, residual fuel oil, and "refined petroleum products," such as gasoline, kerosene, fuel oil and other distillates, refined lubricating oils, diesel fuels, propane, and butane. *Id.*[6]

Congress supplemented the EPAA in 1975 by adding 15 U.S.C. § 760a as part of the amendments enacted under the Energy Policy and Conservation Act, P.L. 94–163. That section authorizes the President to amend the EPAA regulations to exempt the allocation and pricing of "crude oil, residual fuel oil, or any refined petroleum product or refined product category" from the general price and allocation regulations contained in 10 C.F.R. According to section 760a(c)(2), the President must submit any such amendment for congressional approval and must accompany the submission with a statement of his rationale for the amendment. When proposing to exempt a product from price control, the President is required to state to Congress his finding

"that competition and market forces are adequate to protect consumers and that exempting such oil or refined product category *will not result in inequitable prices for any class of users of such oil or product.*"

413 U.S. 405, 421, 93 S.Ct. 2507, 2516, 37 L.Ed.2d 688 (1973)).

**6.** The pervasiveness of federal regulation of the allocation and pricing of petroleum products is illustrated by Executive Order No. 12140, 44 Fed.Reg. 31159 (1979), *as amended by* Executive Order No. 12162, 44 Fed.Reg. 56665 (1979), *reprinted at* 15 U.S.C.A. § 754. When gasoline shortages in 1979 created delays and disruptions at retail gasoline outlets, the need for regulation to protect public safety and order was apparent. Ordinarily, problems such as long lines and minor disorders around gasoline stations would have been a matter for state regulation under the police power. But because of the scope of federal regulation under EPAA, the governors of the various states could take action (*e. g.*, the odd-even system, limitations of each customer's purchase, preferences for certain classes of customers) only after authorization by the President in the cited Executive Order.

**7.** The requirement that exemptions be submitted to Congress lapsed on May 31, 1979.

15 U.S.C. § 760a(d)(1)(B) (emphasis added). The President must also send to Congress with each proposed amendment his views as to the "potential economic impact" of the proposed exemption, including, where practicable, his views on "the State and regional impacts of such amendment"; "the effects of such amendment on the availability of consumer goods and services; the gross national product; competition"; and "the effects on . . . consumer prices." *Id.* § 760a(d)(2).[7] After exempting products, the President may revoke such exemptions if he determines that such revocation is necessary to achieve the federal objectives in the area. *Id.* § 760a(f).[8]

Since June 1, 1976, federal energy authorities have lifted federal price controls on residual fuel oil, 41 Fed.Reg. 13896 (1976); middle distillates, 41 Fed.Reg. 24516–18, 34008 (1976); napthas, gas oils, benzene, greases, lubricated base oil stocks, lubricants, solvents, toluene, unfinished oils, xylene, and other finished products, 41 Fed. Reg. 30096 (1976); aviation fuel, 41 Fed. Reg. 40452 (1976), 44 Fed.Reg. 7070 (1979); and butane and natural gasoline, 44 Fed. Reg. 70118 (1979). Before the exemptions enumerated above went into effect, the actions were submitted to Congress pursuant to 15 U.S.C. § 760a(c)(2), and neither the

*See* 15 U.S.C. § 760g; 44 Fed.Reg. 19425 (1979).

**8.** Title 15 U.S.C. § 760a(f) provides:

"With respect to any oil or refined product category which is exempted pursuant to the provisions of this section, the President shall have authority at any time thereafter to prescribe a regulation or issue an order respecting either the allocation of amounts, or the specification of price or the manner for determining the price, of any such oil or refined product category upon a determination by him that such regulation or order is necessary to attain, and is consistent with, the objectives specified in section 753(b)(1) of this title. Any such oil or refined product category for which allocation or price requirements are reimposed under authority of this subsection may subsequently be exempted without regard to the provisions of subsection (c) of this section [relating to submissions to Congress]."

House nor the Senate disapproved of any of them. The DOE and its predecessor agencies in each instance have made it clear that the price and allocation controls have been converted to standby status, with petroleum product markets subject to continuous monitoring and possible future regulatory action.

This case presents two distinct but related questions with respect to the validity of Connecticut's challenged provision, section 13(b). "The first is whether the statute[ ], viewed independently of federal legislation regulating the [petroleum] industry, burden[s] interstate commerce in a manner contrary to the Commerce Clause." *Lewis v. BT Investment Managers, Inc.,* —— U.S. ——, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980). The second is whether Congress, by its own legislation in this area, has pre-empted the state's legislation. These two barriers to the state's action overlap to some extent.[9] The nexus between the enterprises of the plaintiffs and their interstate activities would be sufficient to justify an examination into whether section 13(b) impermissibly burdens interstate commerce. Although not wholly preclusive, the Commerce Clause gives Congress the power to regulate commerce among the states. However, because Congress *has* exercised the commerce power in the field of production, distribution, and pricing of petroleum products, it will be more appropriate to consider first whether the state's action

must give way in the face of national legislation, which is "supreme" under article VI of the Constitution.

## II.   *THE SUPREMACY CLAUSE*

   The Supremacy Clause declares the law of the United States to be "the supreme Law of the Land . . ., any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S.Const., art. VI, cl. 2.   In determining whether a state statute is pre-empted by federal law, and thus invalid under the Supremacy Clause, the Supreme Court has established a two-pronged test.   "The first inquiry is whether Congress . . . has prohibited state regulation of the particular aspects of commerce involved," *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977)— that is, whether Congress has "sought to occupy the field to the exclusion of the States," *Malone v. White Motor Corp.,* 435 U.S. 497, 504, 98 S.Ct. 1185, 1189, 55 L.Ed.2d 443 (1978).   If Congress has occupied the field, "state laws regulating that aspect of commerce must fall," whether or not they are harmonious with the federal scheme. *Jones v. Rath Packing Co., supra,* 430 U.S. at 525, 97 S.Ct. at 1309.   Second, "[e]ven if Congress has not completely foreclosed state legislation in a particular area, a state statute is void to the extent that it actually conflicts with a valid federal statute." *Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 158,

**9.**   "Certain first principles are no longer in doubt.   Whether as inference from congressional silence, or as a negative implication from the grant of power itself, when Congress has not specifically acted we have accepted the *Cooley* [*v. Board of Wardens of Port of Philadelphia et al.,* 12 How. 299, 13 L.Ed. 996] case's broad delineation of the areas of state and national power over interstate commerce. . . .   Absent congressional action, the familiar test is that of uniformity versus locality: if a case falls within an area in commerce thought to demand a uniform national rule, state action is struck down.   If the activity is one of predominantly local interest, state action is sustained.   More accurately, the question is whether the state interest is outweighed by a national interest in the unhampered operation of interstate commerce.

   "There is no longer any question that Congress can redefine the areas of local and national predominance, . . . despite theoretical inconsistency with the rationale of the Commerce Clause as a limitation in its own right.   The words of the Clause—a grant of power—admit of no other result.   When Congress enters the field by legislation, we try to discover to what extent it intended to exercise its power of redefinition; here we are closer to an intent that can be demonstrated with assurance, although we may employ presumptions grounded in experience in doubtful cases."
*California v. Zook,* 336 U.S. 725, 728, 69 S.Ct. 841, 842, 93 L.Ed. 1005 (1949) (citations omitted).

98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978). The criterion for determining whether such conflict exists "is firmly established": the court must decide whether the state law " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Jones v. Rath Packing Co., supra,* 430 U.S. at 526, 97 S.Ct. at 1310 (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

Although the Supreme Court has attempted various descriptions of the "conflict" required under the second prong of the pre-emption test, it has consistently returned to the formulation enunciated by Mr. Justice Black in *Hines v. Davidowitz*: the Court's "primary function is to determine whether, under the circumstances of [the] particular case, [the state's] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." 312 U.S. at 67, 61 S.Ct. at 404. *Accord, Aronson v. Quick Point Pencil Co.,* 440 U.S. 257, 262, 99 S.Ct. 1096, 1099, 59 L.Ed.2d 296 (1979); *Ray v. Atlantic Richfield Co., supra,* 435 U.S. at 158, 98 S.Ct. at 994; *Jones v. Rath Packing Co., supra,* 430 U.S. at 526, 97 S.Ct. at 1310 (*Hines* test "firmly established"); *DeCanas v. Bica,* 424 U.S. 351, 363, 96 S.Ct. 933, 940, 47 L.Ed.2d 43 (1976); *Perez v. Campbell,* 402 U.S. 637, 649–50, 91 S.Ct. 1704, 1711, 29 L.Ed.2d 233 (1971). Applying the *Hines* test, the Court has persistently invalidated state legislation that "frustrates the full effectiveness of federal law," *Perez v. Campbell, supra,* at 652, 91 S.Ct. at 1712; that betrays a "general incompatibility with basic federal objectives," *Philadelphia v. New Jersey,* 437 U.S. 617, 621 n.4, 98 S.Ct. 2531, 2534, n.4, 57 L.Ed.2d 475 (1978); or whose "consequences sufficiently injure the objectives of the federal program" to result in "frustration to federal policy." *Hisquierdo v. Hisquierdo,* 439 U.S. 572, 583, 589, 99 S.Ct. 802, 809, 59 L.Ed.2d 1 (1979). *Cf. White Mountain Apache Tribe v. Bracker,* —— U.S. ——, 100 S.Ct. 2578, 64 L.Ed.2d —— (1980) (state taxation of non-Indian business operating on reservation lands "would obstruct federal policies" and is pre-empted).

A conflict between state and federal laws may exist despite the absence of literal inconsistency between them. A state regulation will be pre-empted, in other words, not only where federal authorities have promulgated a requirement different from the state's, but where federal authorities have considered the matter and "decided that no such requirement should be imposed at all." *Ray v. Atlantic Richfield Co., supra,* 435 U.S. at 171–72, 98 S.Ct. at 1001. The Supreme Court recently reaffirmed that

> " 'where failure of . . . federal officials affirmatively to exercise their full authority takes on the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute,' States are not permitted to use their police power to enact such a regulation."

*Id.* at 178, 98 S.Ct. at 1004 (quoting *Bethlehem Steel Co. v. New York State Labor Relations Bd.,* 330 U.S. 767, 774, 67 S.Ct. 1026, 1030, 91 L.Ed. 1234 (1947)). If federal authorities have made a considered decision that there should be *no* regulation of a particular subject, in short, *any* state regulation of that subject necessarily conflicts with the federal scheme.

Of course, mere failure to regulate, in and of itself, will rarely constitute an affirmative federal decision that "no such regulation is appropriate or approved" in light of federal policy. Rather, "[t]he pertinent inquiry [is] whether [federal authorities have] addressed and acted upon the question," whether they have given "careful consideration" to factors specified by Congress, and, after balancing the competing interests, whether they have determined that no regulation, or limited regulation, is the proper way of achieving federal goals. *Ray v. Atlantic Richfield Co., supra,* 435 U.S. at 174, 177, 98 S.Ct. at 1004 (holding state vessel-size regulation pre-empted); *National Tank Truck Carriers, Inc. v. Burke,* 608 F.2d 819, 824 (1st Cir. 1979) (affirming grant of preliminary injunction against enforcement of state regulation on pre-emption grounds). When federal au-

thorities have taken these steps, it must be assumed that they have thoroughly considered all the arguments in favor of a given type of regulation, yet have concluded, on balance, that the *absence* of regulation will best serve federal objectives.

■ In sum, a state law will frustrate the full accomplishment of congressional objectives if it directly conflicts with a considered federal determination that a given subject should not be regulated at all. Analysis of the EPAA and its implementing regulations indicates that section 13(b) conflicts in this sense with the federal scheme governing petroleum product pricing.

### A. The Federal Regulatory Scheme
#### 1. The EPAA of 1973.

The EPAA directed the President to promulgate mandatory regulations governing the price and allocation of all petroleum products. 15 U.S.C. § 753(a). In issuing these regulations, the President was directed to consider nine specific objectives, including "equitable distribution of [petroleum products] at equitable prices," "preservation of an economically sound and competitive petroleum industry," "economic efficiency," and "minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms." *Id.* § 753(b)(1)(D), (F), (H), (I). The President, through the authority given him, promptly adopted comprehensive regulations controlling the price of all petroleum products. 39 Fed.Reg. 1949 (1974).

In the legislative history of the 1973 Act, Congress repeatedly voiced its intention that price controls represent a temporary departure from the free market norm and that they be implemented so as to disrupt the free market as little as possible. The Senate Report, for example, stated that the EPAA

"emphasizes the objective of minimizing economic distortion, inflexibility and unnecessary interference in market mechanisms. The Committee intends that [price controls] be temporary and limited in scope, and that they not permanently displace the price system as the main tool

for allocating resources and products in the petroleum industry. [Section 753(b)(1)(I)] indicates the Committee's preference for price flexibility, competition and decentralized decisionmaking."

S.Rep. No. 93–159, 93d Cong., 1st Sess. 25 (1973). The Conference Report noted that the objective of minimizing market interference "requires special mention":

"The committee recognizes that [price controls] necessarily distort the economy and interfere with a free market mechanism. It is the intent of this legislation that economic distortion and interference be minimized to the extent practicable. The President should assure himself that his actions interrupt existing supply mechanisms only when necessary to permit the accomplishment of [EPAA] objectives."

H.R.Conf.Rep. No. 93–628, 93d Cong., 1st Sess. 24 (1973). *Accord,* H.R.Rep. No. 93–531, 93d Cong., 1st Sess. 19 (1973). U.S. Code Cong. & Admin.News, pp. 2582, 2701.

In sum, Congress in 1973 clearly expressed its preference for the free market as the proper determinant of petroleum product prices. It regarded price controls as a necessary, but unfortunate—and in all events temporary—departure from that norm.

#### 2. The EPAA Amendments of 1975.

Congress in 1975 added section 12 to the EPAA, 15 U.S.C. § 760a, authorizing the President, by amendment to the regulations, to exempt petroleum products from price controls, and to convert such controls from "mandatory" to "standby" status. *Id.* § 760a(b), (f). Before proposing any exemption, the President is required to determine that "such amendment is consistent with the attainment, to the maximum extent practicable, of [EPAA] objectives . . . and that the regulation, as amended, provides for the attainment, to the maximum extent practicable, of such objectives." *Id.* § 760a(b). Any proposal to exempt a petroleum product from price controls must be supported by findings that "competition and market forces are adequate to protect

consumers and that exempting [such product] will not result in inequitable prices for any class of users." *Id.* § 760a(d)(1)(B). The President is required to assess the state and regional impacts of any exemption, as well as its effects on competition, small business, unemployment, consumer prices and the Gross National Product. *Id.* § 760a(d)(2). The President is authorized to reimpose price controls at any time, without congressional approval, if he deems them "necessary to attain [EPAA] objectives." *Id.* § 760a(f).

In the legislative history, Congress emphasized that the President must make two distinct determinations when proposing to exempt a petroleum product from price controls. Under section 760a(b), an exemption is permitted only "(1) if [the President] determines that the amendment is consistent . . . with the attainment of [EPAA] objectives . . . and (2) if he *also* determines that the regulation, as amended, provides for the attainment of those *objectives to the maximum extent practicable*." H.R.Rep. No. 94–340, 94th Cong., 1st Sess. 59 (1975), U.S.Code Cong. & Admin.News 1975, pp. 1762, 1821 (emphasis added). The President, in other words, must find *both* that exemption from price controls will not impair realization of national energy goals *and* that the absence of price controls will affirmatively provide for the attainment of those goals in the best possible way.

The legislative history repeatedly confirms Congress' view that exemption from EPAA regulation represents an affirmative federal decision that petroleum product prices be set by the free market. The reports describe the exemption procedure as affecting "a gradual return to an unregulated market," S.Conf.Rep. No. 94–516, 94th Cong., 1st Sess. 203 (1975), U.S.Code Cong. & Admin.News 1975, p. 2044, and as "phasing from a regulated to an unregulated market system." H.R.Rep. No. 94–340, at 57, U.S.Code Cong. & Admin.News 1975, at p. 1819. Both houses expressed their intention that gradual price decontrol, subject to the President's power to reimpose controls should future crises arise, would work "a

smooth transition of petroleum markets from a controlled state to an uncontrolled status subject only to standby authority." H.R.Rep. No. 94–340, at 58, U.S.Code Cong. & Admin.News 1975 at p. 1820. *Accord,* S.Rep. No. 94–516, at 204.

Congress clearly expressed its preference, moreover, that a petroleum product, once returned to the free market, should remain free of price controls indefinitely. The House Report noted that, under the 1973 EPAA, the President was permitted to propose temporary 90–day exemptions, after which time price controls would automatically revert. Pub.L. No. 93–159, § 4(g)(2), 87 Stat. 633. This procedure, the Report explained, was inadequate, for

> "potentially grave dislocations could result as an oil or product which had been subject to controls and exempted from those controls, is resubjected to controls. For the conversion to standby authority mechanism to be meaningful, some degree of stability and certainty regarding the status of an oil or product must be assured."

H.R.Rep. No. 94–340, at 57, U.S.Code Cong. & Admin.News 1975 at p. 1819. In enacting the new section 760a exemption procedure, therefore, Congress clearly intended that price controls, once removed, should be reimposed only if the President found it absolutely necessary, lest the "stability and certainty" of petroleum markets be upset to the detriment of EPAA goals.

Congress thus made its intentions perfectly clear when it enacted the present EPAA exemption procedure in 1975. Both in the statute itself and in the legislative history, Congress expressly declared that the exemption of a given petroleum product from price controls would constitute an affirmative federal decision that EPAA objectives required the price of such product to be set by a free market, subject only to standby federal controls.

### 3. *Administrative Implementation of Exemptions.*

Pursuant to statute, the President has delegated his authority under the EPAA to

the DOE and its predecessor, the FEA. 15 U.S.C. § 754(b); Executive Order 11790, 39 Fed.Reg. 23185 (1974), *as amended by* Executive Order 12038, 43 Fed.Reg. 4957 (1978). Following the procedures outlined in section 760a, those agencies have exempted from price controls all petroleum products except automotive gasoline, propane, and certain natural gas liquids. 10 C.F.R. §§ 210.35, 212.56–.62. Analysis of these administrative proceedings makes clear that the decision to exempt has in each case "take[n] on the character of a ruling that no such regulation is appropriate or approved pursuant to [EPAA] policy," *Ray v. Atlantic Richfield Co., supra,* 435 U.S. at 178, 98 S.Ct. at 1005, and that prices should be set, as Congress envisioned, by the free market. *See* 41 Fed.Reg. 7122–24 (1976) (residual fuel oil); 41 Fed.Reg. 24517 (1976) (middle distillates); 44 Fed.Reg. 7066 (1979) (aviation fuels); 44 Fed.Reg. 70118 (1979) (butane and natural gasoline).

In each case, federal officials explicitly determined (1) that an end to price regulation was *necessary* to achieve EPAA objectives and would affirmatively facilitate the attainment of those objectives to "the maximum extent practicable"; and (2) that petroleum prices should be set by a market free from regulatory constraints. With respect to each exempt product, federal officials "addressed and acted upon the question" of price controls, gave "careful consideration" to the factors specified by Congress, and, after balancing the competing interests, "decided that no such requirement should be imposed at all." *Ray v. Atlantic Richfield Co., supra,* at 171–72, 174, 177, 98 S.Ct. at 1001, 1003, 1004. The exemption decision, in short, has uniformly "'take[n] on the character of a ruling that no [price] regulation is appropriate or approved pursuant to the policy of the [EPAA].'" *Id.* at 178, 98 S.Ct. at 1005 (quoting *Bethlehem Steel Co. v. New York*

*State Labor Relations Bd., supra,* 330 U.S. at 774, 67 S.Ct. at 1030).

Thus, the petroleum products presently exempt from federal price regulation are not exempt because Congress, the President, and the DOE are no longer concerned with them. Rather, as the history accompanying each amendment makes clear, an unregulated market system has been chosen deliberately as the federal policy for these products. Moreover, this deliberate and continuing federal policy is evident from the authority of the President and his delegates to reimpose direct price regulation, if they determine that the revocation of exemptions becomes necessary to achieve the federal objectives in the area.

B. *Section 13(b) Directly Conflicts With the Federal Policy Embodied in the EPAA*

Section 13(b) of the Act represents an attempt by Connecticut to regulate the market price of petroleum products and is thus a form of price control.[10] *See Schirtzinger v. Dunlop,* 489 F.2d 1307, 1310 (Temp.Emer.Ct.App.1973) (treating pass-through provisions as price regulation). This price control mechanism operates only on petroleum products "exempt from [the EPAA]." In thus confining the operation of section 13(b), the Connecticut General Assembly may have drawn the inference that federal authorities, by removing price controls from certain petroleum products, intended to permit the states to regulate the price of such products as they saw fit. However, analysis of the EPAA, its legislative history, and its administrative implementation reveals that "exemption"—far from relinquishing petroleum product pricing to state regulation—constitutes an affirmative federal decision that petroleum products should be free from *all* price regu-

---

**10.** It is no answer for the state to contend that section 13(b) merely provides a *method* for recovering the tax paid under section 1. That the plaintiffs can recoup the cost of the tax via the route permitted under section 13(b) does not render that provision any less a price regulation. It distorts market conditions by keeping prices artificially low in Connecticut. At the same time, it encourages an artificial price hike in other states along the eastern seaboard. This is precisely one of the evils that the EPAA sought to combat. *See* note 4 *supra*; note 13 *infra*.

**1014**

lation, and that EPAA objectives will best be served by an unregulated free market subject only to standby federal controls. Section 13(b) is plainly in direct conflict with the federal regulatory scheme outlined above—i. e., it directly conflicts with the federal determination, reached by the President and approved by Congress, that such products should be free of price regulation and their prices established by an "unimpeded free market." [11]

■ Section 13(b) "frustrates the full effectiveness of federal law" in several ways. *Perez v. Campbell, supra,* 402 U.S. at 652, 91 S.Ct. 1712. In 1975, Congress warned of "potentially grave dislocations" that could result if products exempted from price regulation were "resubjected to controls," stressing that market "stability and certainty" were essential to the federal standby regulatory scheme. Section 13(b), by subjecting federally exempt products to a new form of price control, risks just such dislocations. By prohibiting suppliers from raising their prices in Connecticut by more than an arbitrary "average" amount, regardless of supply/demand or cost factors that might call for higher prices in Connecticut, section 13(b) will create the "artificial market conditions" that FEA labeled "extremely detrimental to the nation." *Findings and Views Concerning the Exemption of Middle Distillates from the Mandatory Petroleum Allocation and Price Regulations* 125 (June 15, 1976). By preventing suppliers from fully recovering, through prices charged in Connecticut, the true economic cost of products sold in Connecticut, section 13(b) will

induce suppliers to sell their products in other states, risking the very "supply problems" and "market distortions" that DOE, in removing controls, endeavored to eliminate. Section 13(b), in short, tampers with the "free market" in just the way Congress wished to avoid: it results in "economic inefficiency" and "unnecessary interference with market mechanisms" in flat defiance of the explicit statutory goals of the EPAA.

There can be no doubt that section 13(b) of the Act directly conflicts with the federal energy policy embodied in the EPAA. Because it subjects to price regulation petroleum products that federal authorities have decided should be free of price regulation, section 13(b) "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in enacting the EPAA. *Hines v. Davidowitz, supra,* 312 U.S. at 67, 61 S.Ct. at 404. Accordingly, under the test for pre-emption enunciated by the Supreme Court, section 13(b) is invalid under the Supremacy Clause.

It is within neither this court's realm nor its competence to evaluate the wisdom of federal energy policy, nor the economic theories that underlie it.[12] Suffice it to say, the question whether the plaintiffs could "afford" to bear alone the tax imposed by section 1 of the Act is irrelevant to the decision in this case, as are arguments proffered by the *amici* who contend that the tax cost could and ordinarily would be spread throughout the several states. All this may be so.[13] But inasmuch as section 13(b) con-

11. The EPAA contains no express provision pre-empting state laws governing petroleum product *pricing. But cf.* 15 U.S.C. § 755(b) (pre-empting state *allocation* laws that conflict with federal regulations). The Supreme Court has explicitly held, however, that, even if a given state law is not covered by a federal statute's express pre-emption provision, the Court "still must determine whether the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,'" *Jones v. Rath Packing Co., supra,* 430 U.S. at 540–41, 97 S.Ct. at 1317, *i. e.,* whether the state law is invalid on "conflict" grounds.

12. According to those theories, section 13(b)'s price restraints will not deter consumption of energy; at the same time, they will remove incentives to explore for and produce alternative sources of petroleum when the country's need is for larger domestic oil supplies and independence from foreign oil.

13. The latter point, however, is of doubtful validity. In *Mobil Petroleum Co.,* No. FEE–4296 (June 23, 1977), DOE granted Mobil's application for permission to pass on the cost of Guam's gross receipts tax on retail sellers entirely to Guamanian consumers. DOE reasoned that to spread the cost of the tax wherever *Mobil* does business would be "inequita-

travenes federal policy by attempting to regulate the price that may be charged in Connecticut for the affected petroleum products, that provision cannot stand.

## III. *RELIEF*

■ The plaintiffs have asked for both declaratory and injunctive relief against the implementation and enforcement of section 13(b). The irreparable injury required for an injunction, however, could only have been said to exist, if at all, while the plaintiffs awaited a final decision in this action. Moreover, a declaratory judgment will afford the plaintiffs full and complete relief,[14] since "a judgment of this court would probably have the same effect upon Connecticut state officials as an injunction." *Arrow Lakes Dairy, Inc. v. Gill*, 200 F.Supp. 729, 737 (D.Conn.1961). Such an injunction, if it later proves to be necessary, may be sought under 28 U.S.C. § 2202. Hence, it is declared that section 13(b) of Connecticut Public Act 80–71 is unconstitutional in that it is pre-empted by federal law and thus violates the Supremacy Clause.[15]

ble" and thus "would frustrate one of the objectives that Congress sought to further in the [EPAA], that of providing for the 'equitable distribution of . . . refined petroleum products at equitable prices among all regions and areas of the United States.'" *Id.* at 6.

The Connecticut General Assembly was well aware of the Guam decision when it adopted section 13(b). Proceedings of the House of Representatives at 143–44 (Apr. 11, 1980) (remarks of Rep. Emmons); *id.* at 174 (remarks of Rep. Van Norstrand); Proceedings of the Senate at 75–76, 77–78 (remarks of Sen. Johnson). But as the Supreme Court has often recognized in the Commerce Clause context, "to the extent that the burden of state regulation falls on interests outside the state, it is unlikely to be alleviated by the operation of those political restraints normally exerted when interests within the state are affected." *Southern Pacific Co. v. Arizona*, 325 U.S. 761, 767 n. 2, 65 S.Ct. 1515, 1519, 89 L.Ed. 1915 (1945) (citations omitted).

**14.** Irreparable injury is not a prerequisite to the issuance of declaratory relief. *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937).

**15.** The declaratory judgment issued herein does not affect the validity of the tax enacted by

Let judgment enter accordingly. It is SO ORDERED.

## APPENDIX

### PUBLIC ACT NO. 80–71

### AN ACT CONCERNING STATE REVENUE FOR THE FISCAL YEAR COMMENCING JULY 1, 1980.

Be it enacted by the Senate and House of Representatives in General Assembly convened:

Section 1. (NEW) Any petroleum company which is engaged primarily in the refining and distribution of petroleum products and distributes such products to wholesale and retail dealers for marketing and distribution in this state shall pay a quarterly tax at the rate of two per cent of gross earnings in each taxable quarter derived by such company from the sale of petroleum products in this state. No deduction shall be made from such gross earnings for any commission, rebate or other payment, except a refund resulting from an error or overcharge. Each such company shall, on or before the last day of January,

section 1 of the Act, since the Act contains a severability clause in section 15.

The fact that a severability clause was included casts doubt on the ingenuousness of the state's argument that the tax was intended by the legislature to be assessed on the plaintiffs themselves. Section 15 makes it evident that the state's primary interest was in the *collection* of the tax. Who would bear the burden was of only secondary significance to the legislature.

Furthermore, Connecticut's tax is not earmarked for any particular purpose whatsoever; its yield goes entirely to the general fund. Even if the court were disposed to undertake a Commerce Clause analysis, it could discern no relationship between section 13(b) and the state's purported interest in safety, health, or the reputable operation of the business carried on by the plaintiffs. The state's suggestion that price restraints are necessary to protect the health of home heating oil users could just as well apply to food, soap, or any other product necessary to consumers' health and safety. And surely that goal does not require regulation of the price of jet fuel, lubrication oil, or the many other products affected by section 13(b).

April, July and October of each year, render to the commissioner of revenue services under oath of its treasurer or the person performing the duties of treasurer or of an authorized agent or officer, a return on forms prescribed or furnished by said commissioner, including in respect to such company the amount of gross earnings from the sale of petroleum products within this state for the quarter ending with the last day of the preceding month. The tax imposed under this act shall be in addition to any other tax imposed by Connecticut with respect to which such company is liable. For purposes of sections 1 to 16, inclusive, of this act "petroleum products" includes any product which contains or is made from petroleum or a petroleum derivative and "gross earnings" are those earnings from the sale of petroleum products to which the sales factor is applied under subdivision (3) of section 12–218 of the general statutes and those earnings from such sales made by any corporation in which any such petroleum company owns not less than twenty-five per cent of the stock of such corporation.

\*        \*        \*        \*        \*        \*

Sec. 7. (NEW) The tax imposed under section 1 of this act shall be due and payable upon the last day upon which a return may be filed without penalty under said section 1. Upon the filing of such return, the full amount of the tax payable, as the same is computed by the taxpayer, shall be paid to the commissioner of revenue services in cash or by check, draft or money order drawn to the order of the commissioner of revenue services. Said commissioner shall, within three years after the due date for filing such return, or in the case of a completed return filed after such due date, within three years after the date on which such return was received by said commissioner, examine it and in case any error is disclosed by such examination, within thirty days after such disclosure, notify the taxpayer thereof. Within thirty days of the mailing of such notice, the taxpayer shall pay to said commissioner, in cash or by check, draft or money order drawn to the order of the commissioner of revenue services, any additional amount of tax shown to

be due by the corrected return or shall be paid by the state treasurer, upon order of the comptroller, any amount shown to be due such taxpayer by such corrected return. The failure of such taxpayer to receive any notice required by this section shall not relieve such taxpayer of the obligation to pay the tax imposed under section 1 of this act or any interest or penalties thereon. When, before the expiration of the time prescribed in this section for the examination of the return or the assessment of said tax, both said commissioner and such taxpayer have consented in writing to such examination or assessment after such time, the return may be examined and said tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon. Said commissioner may also in such a case waive the statute of limitations against a claim for refund by such taxpayer.

\*        \*        \*        \*        \*        \*

Sec. 13. (NEW) (a) It is not the intention of the general assembly that the tax imposed under section 1 of this act be construed as a tax upon purchasers of petroleum products, but that such tax shall be levied upon and be collectible from petroleum companies as defined in said section 1, and that such tax shall constitute a part of the operating overhead of such companies.

(b) No petroleum company subject to the tax imposed under section 1 of this act shall raise its posted wholesale rack price in Connecticut for any petroleum product exempt from the federal Emergency Petroleum Allocation Act (P.L. 93–159) by an amount higher than the average amount by which such company raises its wholesale rack price for such product in all ports on the eastern coast of the United States.

\*        \*        \*        \*        \*        \*

Sec. 15. (NEW) If any section, part, clause or phrase in sections 1 to 16, inclusive, of this act, is for any reason held to be invalid or unconstitutional, sections, parts,

clauses and phrases in said sections not held to be invalid or unconstitutional shall not be affected and shall remain in full force and effect.

  * * * * * *

Sec. 30. This act shall take effect July 1, 1980, provided (1) sections 1 to 16, inclusive, shall be applicable to calendar quarters commencing on or after July 1, 1980, (2) sections 22, 25, 26, 27 and 29 shall take effect from passage and (3) section 28 shall take effect January 1, 1981.