OPINION OF THE COURT
Joseph Jaspan, J.
The New York State Legislature in extraordinary session held in November, 1979 determined that a valid State interest would be served by enactment of legislation designed to discourage price gouging by merchants of home heating oil (General Business Law, § 396-r; L 1979, ch 730, eff Nov. 5,1979).
In this action the Attorney-General seeks pursuant to subdivision 12 of section 63 of the Executive Law to enforce as against the respondent Strong Oil Company, Inc., the remedial provisions of that section which authorizes an injunction, a civil penalty not to exceed $5,000 and where appropriate, restitution to aggrieved consumers.
The respondent denies the material allegations of the amended petition herein and as affirmative defenses challenges the constitutionality of the statute.
*807 The respondent urges that the statute is unconstitutionally vague and overbroad, is pre-empted by Federal statutes and thus in violation of the supremacy clause of the United States Constitution (art VI, § 2) and otherwise in violation of the due process clauses in the State and Federal Constitutions.
The Oil Heating Institute of Long Island, Inc., has been denied leave to intervene, but has been granted leave to file an amicus brief.
Examination of section 396-r of the General Business Law indicates that the legislative intent underlying the statute was to impose civil penalties upon merchants who charged “grossly excessive prices for essential consumer goods and services” during periods of “abnormal disruption of the market”. (Italics supplied.)
That this statute might be directed against commodities such as milk and gasoline as well as home heating oil is clear from the definition of consumer goods and services contained within the statute, to wit, “those used, bought or rendered primarily for personal, family or household purposes” (see Memoranda of Governor, NY Legis Ann, 1979, p 451; and of State Executive Dept. McKinney’s 1979 Session Law News of NY [Dec., No. 7], p A-4).
Equally clear is the fact that implementation of the legislation is conditional upon the happening of some future event, to wit, a legislative finding that an “abnormal disruption of the market” exists.
A statute may be enacted in such a form that it shall have no effect until the happening of some future event, certain or uncertain. (Barto v Himrod, 8 NY 483; Matter of Roosevelt Raceway v County of Nassau, 18 NY2d 30, opp dsmd 385 US 453.) In this regard it has been said that while most laws are “ ‘complete when passed, they sleep until the contingency contemplated sets them in motion’ ” (Matter of Olp v Town of Brighton, 173 Misc 1079, affd 262 App Div 944; People v Kearse, 56 Misc 2d 586, 590; McKinney’s Cons Laws of NY, Book 1, Statutes, § 43, p 84).
While the Legislature has declared an “abnormal disruption” for the 1979-1980 heating season, it is clear that section 396-r did not automatically terminate at the end of *808 that heating season but only remains inert until such future time as the Legislature again declares an “abnormal disruption” with respect to heating oil, or milk, or gasoline or any other essential consumer goods and services. The constitutional challenge survives.
These proceedings and the legal arguments with respect .thereto relate only to home heating oil. This opinion is not intended to encompass any other consumer product or service.
The essence of the statute is reflected in the following quoted paragraph from the statement of legislative findings. “In order to prevent merchants from taking unfair advantage of consumers during abnormal disruptions of the market, the legislature declares that the public interest requires that such conduct be prohibited and made subject to civil penalties.” (General Business Law, § 396-r, subd 1.)
The act prohibits the sale of the covered goods and services at an “unconscionably excessive price” and defines that phrase in terms of gross disparity between the price of goods or services and their value measured by prices at which they were available in the usual course of business prior to the disruption of the market or the difference between the price charged and the price at which the same goods or services were readily attainable by other consumers in the trade area provided the higher price is not attributable to higher cost.
The allegation that respondent is price gouging is based upon the following claims of petitioner.
A survey by the Attorney-General indicated that the prices of home heating oil in Long Island on January 9 to 10, 1980 was between $.87.9 to $.96.9 per gallon with an average price of $.92.3. A second survey on February 20 to 21, 1980 showed the price range to be between $.95.9 to $.99.1 or an average of $.97.3 per gallon. Selective surveys by the State energy office of 16 dealers in Suffolk County and 26 dealers in Nassau County revealed an average price of about $.94 per gallon with a high in each county of $.96.9 per gallon.
The respondent is alleged to have charged $1.00.9 per gallon on and before January 23, 1980.
*809 Respondent’s reply creates factual disputes not readily resolved on motion, but are rendered academic by the resolution of the legal questions posed by the challenge to the law.
FEDERAL PRE-EMPTION
Respondent argues that this legislation is a price control statute in conflict with and pre-empted by the Emergency Petroleum Allocation Act of 1973 (EPAA of 1973, US Code, tit 15, § 751 et seq., as amd in 1975). The amendment (US Code, tit 15, § 760a) authorized the President to exempt petroleum products from fuel controls and to convert such controls from mandatory to standby status.
Subdivision 2 of article VI of the United States Constitution, the supremacy clause, provides: “This Constitution, and the Laws of the United States which shall be made in Pursuance thereof * * * shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.”
In determining whether a State statute is pre-empted by Federal law and thus invalid under the supremacy clause, the court begins with “ ‘the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress’ ” (Ray v Atlantic Richfield Co., 435 US 151, 157).
In this regard, the United States Supreme Court has established a two-pronged test for finding pre-emption of State legislation by Federal laws.
The first prong is whether Congress has prohibited State regulation of the particular field involved (Jones v Rath Packing Co., 430 US 519), that is, whether Congress has chosen to completely “occupy the field to the exclusion of the States” (Malone v White Motor Corp., 435 US 497, 504), in which case the States may not regulate within the field even where the regulation is in harmony with the Federal scheme (Mobil Oil Corp v Tully, 499 F Supp 888, 896).
The second is where, although Congress has chosen not to *810 completely occupy a particular field “a state statute is void to the extent that it actually conflicts with a valid federal statute” (Ray v Atlantic Richfield Co., supra, at p 158). In this regard, the criteria for such a determination is “firmly established” — the court must decide whether the State law “stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress” (Jones v Rath Packing Co., supra, at p 526; Hines v Davidowitz, 312 US 52, 67; Mobil Oil Corp. v Dubno, 492 F Supp 1004, 1010).
The intent of Congress to completely occupy a particular field and thereby preclude any State regulation thereof may be found from either an “explicit statement” in the Federal statute or implied from the statute’s “structure and purpose” (Jones v Rath Packing Co., supra, at p 525). Such an implied intent may be found where the “scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for States to supplement it. * * * Or the Act of Congress may touch a field in which the federal interest is so dominant that the federal systems will be assumed to preclude enforcement of state laws on the same subject. * * * Likewise, the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose” (Rice v Santa Fe Elevator Corp., 331 US 218, 230).
“Deciding whether a state státute is in conflict with a federal statute and hence invalid under the Supremacy Clause is essentially a two-step process of first ascertaining the construction of the two statutes and then determining the constitutional question whether they are in conflict.” (Perez v Campbell, 402 US 637, 644.)
Thus, the first task before this court is the construction of section 396-r of the General Business Law, a matter not previously considered by any court of record.
“Construction” as a process for determining the meaning of statutes is defined as the “drawing of conclusions with respect to subjects which lie beyond the direct expression of the text from elements known from, and given in, the text.” “Construction” may be reached by reasoning from extraneous connected circumstances, laws, or writings, bear *811 ing on the same or a connected matter or by seeking and applying the probable aim and purpose of the provisions. (McKinney’s Cons Laws of NY, Book 1, Statutes, § 71, p 138; 2525 East Ave. v Town of Brighton, 33 Misc 2d 1029, affd 17 AD2d 908.)
It is well established that the primary consideration of the court is to ascertain and give effect to the Legislature’s intent. (McKinney’s Cons Laws of NY, Book 1, Statutes, § 92, p 176; Rankin v Shanker, 23 NY2d 111.) The judicial function is to “interpret, declare, and enforce the law, not to make it, and it is not for the courts to correct supposed errors, omissions or defects in legislation.” (McKinney’s Cons Laws of NY, Book 1, Statutes, § 73, pp 145, 147-148; Matter of Russo v Valentine, 294 NY 338; Meltzer v Koenigsberg, 302 NY 523.)
As set forth supra, the Legislature made a specific finding that it intended to impose a “civil penalty” upon those merchants who had been found to be charging “unconscionably excessive price [s]” for home heating fuel during “periods of abnormal disruption of the market”. The Legislature further found that such an abnormal disruption existed for the 1979-1980 heating season.
This legislative intent was further emphasized in both the memoranda of the State Executive Department and of the Governor which accompanied the bill.
Specifically, the Executive Department stated:
“Additionally, the prices of home heating oil have risen drastically.
“This bill would protect consumers against ‘price gouging’ by making the practice illegal and providing that significant civil penalties be levied against those who obey the law.” (McKinney’s 1979 Session Law News of NY [Dec., No. 7], p A-5.)
The Governor on approving the bill stated: *812 heating costs. These price increases must be justified; the State cannot tolerate excessive prices for a commodity which is essential to the health and well-being of millions of the State’s residents.” (NY Legis Ann, 1979 pp 451-452; italics supplied.)
*811 “At present, there is no express legal prohibition against charging exorbitant prices for essential consumer goods and services during abnormal disruptions of the market. * * *
“It is estimated that poverty level households will pay between $300-350 million this heating season in additional
*812 It is thus clear from the statute itself and the memorandum in its support that the Legislature intended to:
(1) retain the power to declare what may or may not be an “abnormal disruption of the market”, and
(2) to vest the court with the power to determine whether a merchant is charging an unconscionably excessive price, and
(3) to enjoin the continued sale by home and heating fuel by a merchant at other than a normal market price, and
(4) to impose a fine of not more than $5,000, and
(5) to vest the court with the power to order a merchant to make restitution to aggrieved customers.
The particular effect of items 2 through 5 above is to establish a de facto price control upon home heating fuel.
The court must consider whether this legislation is in conflict with the Federal statutes and regulations thereunder.
A complete and concise history of the EPAA and the Congressional intent thereof is set forth in the cases of Mobil Oil Corp. v Tully (499 F Supp 888, supra) and Mobil Oil Corp. v Dubno (492 F Supp 1004, supra.)
Section 753 of the EPAA of 1973 directed the President to promulgate mandatory regulations governing the price and allocation of all petroleum products (US Code, tit 15, § 753, subd [a]) and included a specific direction that these regulations be based upon considerations which included the “preservation of an economically sound and competitive petroleum industry; including the priority needs to restore and foster competition in the producing, refining, distribution, marketing, and petrochemical sectors of such industry, and to preserve the competitive viability of independent refiners, small refiners, nonbranded independent *813 marketers, and branded independent marketers” (US Code, tit 15, § 753, subd [b], par [1], cl [D]) “economic efficiency” (US Code, tit 15, § 753, subd [b], par [1], cl [H]); and “minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms” (US Code, tit 15, § 753, subd [b], par [1], cl [I]; S Rep No. 93-159 [93d Cong, 1st Sess], p 25; HR Conf Rep No. 93-628, US Code Cong & Admin News, 1973, vol 2, pp 2700-2701; HR Rep No. 93-531, US Code Cong & Admin News, 1973, vol 2, pp 2595-2596; italics supplied).
Thus, Congress in 1973 clearly expressed its preference for the free market as the proper determinant of petroleum product prices and regarded price controls as but a temporary but necessary departure from that norm.
The pervasiveness of the Federal regulation of the allocation and pricing of petroleum products is best illustrated by section 754 of title 15 of the United States Code, the “Administration and enforcement; delegation of authority; civil and criminal penalties” provision of the EPAA which precluded the States from enacting programs of odd-even rationing, limitations on a customer’s purpose and preference for certain classes of customers, except upon authorization by the President pursuant to this section (Mobil Oil Corp. v Dubno, 492 F Supp 1004, 1008, n 6, supra).
In 1975 Congress, in pursuit of its goal to return to a free market system, added section 760a of title 15 of the United States Code authorizing the President, by amendment to the regulations and in accordance with the guidelines and procedural requirements set forth in the law, to exempt crude oil, residual fuel oil, or any refined petroleum product or refined product category from price and allocation controls and to convert such controls from “mandatory” to “standby” status (US Code, tit 15, § 760a, subds [b], [f]).
Before proposing such exemptions there must be a determination by the President that “such amendment is consistent with the attainment, to the maximum extent practicable, of the objectives specified in section 753 (b) (1) [US Code, tit 15, § 753, subd (b), par (1), els (D), (H), (I) are set forth supra~\ of this title and that the regulation, as amended, provides for the attainment, to the maximum ex *814 tent possible, of such objectives” (US Code, tit 15, § 760a, subd [b] ; italics supplied).
In addition, before the President could request Congress to exempt a specific product from price controls, he was required to submit “a finding that competition and market forces are adequate to protect consumers and that exempting such oil or refined product category will not result in inequitable prices for any class of users of such oil or product” (US Code, tit 15, § 760a, subd [d], par [1], cl [B] ; italics supplied).
The President was further required to assess the State and regional impact of any exemption, as well as its effects on competition, small businesses, employment, consumer prices and the gross national product (US Code, tit 15, § 760a, subd [d], par [2]).
In other words the President must find “both that exemption from price controls will not impair realization of national energy goals and that the absence of price controls will affirmatively provide for the attainment of those goals in the best possible way” (Mobil Oil Corp. v Dubno, 492 F Supp 1004, 1012, supra).
Pursuant to this exemption procedure residential fuel oil (41 Fed Reg 13896, April 1, 1976); No. 2 heating oil and No. 2-D diesel fuel (41 Fed Reg 24518, June 16, 1976); No. 1 heating oil, No. 1-D diesel fuel and kerosene (41 Fed Reg 24518, June 16, 1976) and various other petrochemical products have been exempted from price controls. At the present time only automotive gasoline, propane and certain natural gas liquids remain subject to price control regulations.
In each instance where a determination was made to exempt a particular product there was an affirmative finding that “competition and market forces provide adequate protection for consumers” and that exemption will not result in inequitable prices for any class of users (Mobil Oil Corp. v Tully, 499 F Supp 888, 901, supra).
Importantly, pursuant to 41 Fed Regs 30096 and 30098 the price control regulations have not been repealed but in effect have been “converted to standby status, so that in the event of shortages or other occurrences which might require *815 reimposition on controls, they may be quickly put into effect.”
Senate Conference Report No. 94-516 (US Code Cong & Admin News, 1975, vol 2, p 2045) describes the exemption procedure as effecting “a gradual return to an unregulated market” while House of Representatives Report No. 94-340 (US Code Cong & Admin News, 1975, vol 2, p 1819) describes it as “phasing from a regulated to an unregulated market system.”
Moreover, House of Representatives Report No. 94-340 clearly expresses Congressional intent that once a petroleum product was returned to the free market it was to remain free of controls indefinitely subject only to standby Federal controls. The report stated (Id., p 1819) : “potentially grave dislocations could result [if] an oil * * * product which had been subject to controls and exempted from those controls, is resubjected to controls.”
“Thus, the petroleum products presently exempt from federal price regulation are not exempt because Congress, the President and the DOE [Department of Energy] are no longer concerned with them. Rather, as the history accompanying each amendment makes clear, an unregulated market system has been chosen deliberately as the federal policy for these products. Moreover, this deliberate and continuing federal policy is evident from the authority of the President and has delegates to reimpose direct price regulation, if they determine that the revocation of exemptions becomes necessary to achieve the federal objectives in the area.” (Mobil Oil Corp. v Dubno, 492 F Supp 1004, 1013, supra.)
The petitioner, relying on subdivision (b) of section 755 of the EPAA, however, contends that Congress did not intend to occupy the entire field and that it only sought to control “ ‘a national energy crisis’ by creating a ‘national distribution system’ for certain petroleum products and authorizing the imposition of price and allocation controls on such products.”
That subdivision provides: “The regulation under section 753 of [title 15 of the United States Code] and any order issued thereunder shall preempt any provision of any program for the allocation of crude oil, residual fuel oil, or any *816 refined petroleum product established by any State or local government if such provision is in conflict with such regulation or any such order.”
Petitioner claims that this provision clearly establishes that Congress only intends to pre-empt State regulations dealing with the allocation of oil products and that “wide latitude is still available for state regulation in relation to pricing.”
Stated differently, petitioner is asking this court to hold that section 755 precludes the application of the “exclusive occupation” or “conflict” tests articulated by the Supreme Court in supremacy clause cases.
“Any possibility that the existence of a specific pre-emptian provision in Federal legislation precludes application of the general pre-emption principles is quickly dispelled by the decision of the Supreme Court in Jones v. Rath Packing Co., supra. [That] Court * * * after concluding that an express pre-emption provision did not invalidate a state law, found that the finding did not resolve the case because the Court still had to ‘determine whether the state law stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress.’ Id. 430 U.S. at 540-541, 97 S.Ct. at 1317.” (Mobil Oil Carp. v Tully, 499 F Supp 888, 902, supra.)
It is thus clear from the foregoing analysis that Congress by the passage of and amendments to the EPAA has occupied the field to the exclusion of the States and has accordingly prohibited State regulation thereof.
Section 396-r of the General Business Law is, as stated supra, an attempt by the State to declare whether or not abnormal market conditions, exist and to impose de facto price controls on home heating fuel upon such a determination. The State therefore has legislated in a field pre-empted by Federal law.
The court also finds that even if Congress did not completely occupy the field, section 396-r would still be violative of the supremacy clause since it is in direct conflict with the Federal law in that it stands as an obstacle to the accomplishment and execution of the full purpose and objectives *817 of Congress and frustrates the full effectiveness of Federal law.
As stated supra, the clear intent of Congress is that prices for petroleum products should be set by a market free from regulatory restraints.
Exempting a product from price controls “rather than constituting an end to Federal regulation over those products, represents an affirmative administrative determination that ‘no such regulation is appropriate * * * pursuant to the policy of the statute’ ” (Mobil Oil Corp. v Tully, 499 F Supp 888, 909, supra; Ray v Atlantic Richfield Co., 435 US 151, supra).
In the instant case, Congress has seen fit to exempt the pricing of home heating fuels and in so doing has specifically found that free market forces will provide adequate or possibly greater protection for consumers and that the deregulation would not result in inequitable prices for any class of users.
The court recognizes the oligopolistic nature of the oil industry- and the fact that it could, with very little trouble, attempt to fix the prices of home fuel oil as between the various suppliers. However, such attempt might very well violate the antitrust laws and be enjoined accordingly.
The Federal policy of achieving “equitable distribution” and “equitable prices” among “all regions and areas of the United States” (US Code, tit 15, § 753, subd [b], par [1], cl [F]) may not be frustrated by the individual State’s desire to protect a segment of its population. A State law cannot escape invalidation on pre-emption grounds because it is designed to promote a valid State interest (Perez v Campbell, 402 US 637, 651-652, supra). As stated in Perez (supra, pp 651-652): “We can no longer adhere to the aberrational doctrine * * * that state law may frustrate the operation of federal law as long as the state legislature in passing its law had some purpose in mind other than one of frustration. Apart from the fact that it is at odds with the approach taken in nearly all our Supremacy Clause cases, such a doctrine would enable state legislatures to nullify nearly all unwanted federal legislation by simply publishing a legislative committee report articulating some state *818 interest or policy — other than frustration of the federal objective — that would be tangentially furthered by the proposed state law.”
In Mobil Oil Corp. v Dubno (492 F Supp 1004, supra) the State of Connecticut enacted legislation (Public Act 80-71 of the 1980 Connecticut General Assembly) which imposed a 2% tax on the gross receipts upon refiners and distributors of petroleum products with respect to their petroleum sales within the State. Subdivision (a) of section 13 of the act provided that the tax was to be treated as part of the “operating overhead of such companies.” Subdivision (b) of section 13, “implementing the intent of Section 13 (a)”, prohibited the subject companies from raising their wholesale prices by any amount higher than the average amount by which they raised such prices “in all ports of the eastern coast of the United States.” The statute further provided that the pricing provisions applied only to petroleum products “exempt from the federal Emergency Petroleum Allocation Act”.
The court in holding that subdivision (b) of section 13 conflicted with and contravened Federal policy by attemping to regulate the price that may be charged in Connecticut for the affected petroleum products and as such violated the supremacy clause of the United States Constitution, stated: “There can be no doubt that section 13 (b) of the Act directly conflicts with the federal energy policy embodied in the EPAA. Because it subjects to price regulation petroleum products that federal authorities have decided should be free of price regulation, section 13(b) ‘stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress’ in enacting the EPAA.” (Mobil Oil Corp. v Dubno, supra, p 1014.)
In Mobil Oil Corp. v Tully (499 F Supp 888, supra) New York State enacted the “Mass Transit State Aid — Oil Company Surtax” (L 1980, ch 271; L 1980, ch 272, eff June 18, 1980) which imposed an annual tax “upon every oil company equal to two per centum of its gross receipts from all sources, or the portion thereof allocated within the state as hereinafter provided”. (L 1970, ch 271, § 3.)‘ “Gross receipts” includes all receipts with the exception of “Receipts *819 received by reason of any sale of fuel oil (excluding diesel motor fuel) used for residential purposes” or from resales to other oil companies subject to the tax. (L 1980, ch 271, §3.)
In addition, the statute provided that: “The tax imposed by this section and any penalty which may be assessed under this subdivision shall be a liability of the oil company, shall be paid by such company and shall not be included, directly or indirectly, in the sales price of its products sold in this state.” (L 1980, ch 271, § 3; Tax Law, § 182, subd 12, par [a].)
The court held that the anti-pass-through provision unconstitutionally violated the supremacy clause since the provision conflicted with the Federal policy under the EPAA with regard to both exempt petroleum products as well as petroleum products presently subject to mandatory price controls. With regard to exempt petroleum products the court stated:
“Aside from imposing price controls in an area which Federal authorities have determined should be free of price regulation, the anti-pass through provision conflicts with the objectives which the Federal agencies were obligated to consider in making decisions to deregulate. Just as was recognized in Mobil Oil Co. v Dubno, supra, Slip. op. at 21: ‘preventing suppliers from fully recovering, through prices charged in [New York], the true economic cost of products sold in [New York] . . . will induce suppliers to sell their products in other states, risking the very ‘supply problems’ and ‘market distortions’, the DOE in removing controls, endeavored to eliminate.’
“The provision presents a serious threat to the ‘equitable distribution of * * * refined petroleum products at equitable prices among all regions and areas of the United States,’ 15 U.S.C. § 753(b) (1) (F), and ‘stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress’ in enacting the EPAA.” (Mobil Oil Corp. v Tully, supra, p 910.)
These courts did not reach the issue as to whether Congress intended to occupy the entire field.
Consistent with these rulings and for the reasons set forth *820 supra, this court finds section 396-r of the General Business Law to be in conflict with Federal law in an area which Congress intended to occupy the entire field and thus is in violation of the supremacy clause of the United States Constitution.
Absent a current declaration that there is an abnormal disruption in the market for home heating oil, this statute will remain inert with respect thereto. It is possible, however, that when it is activated, it will no longer be in conflict with Federal legislation and regulation. Accordingly, this court must address itself to the sufficiency of the statutory language.
VAGUENESS
The respondent also asks this court to declare section 396-r of the General Business Law unconstitutional upon the ground that this statute is unconstitutionally vague and overbroad in its use of the terms “unconscionably excessive price”, “grossly excessive prices” and “trade area” in that it fails to set forth any ascertainable standard by which the respondent can determine the range of prices which it could charge and remain within the permissible limits.
In relevant part, section 396-r provides: *821 the amount charged grossly exceeded the price at which the same or similar goods or services were readily obtainable by other consumers in the trade area, and, in addition, that (c) the amount charged by the merchant was not attributable to additional costs imposed by its suppliers, shall constitute prima facie proof of a violation of this section in any proceeding commenced by the attorney general pursuant to subdivision four hereof.” (Emphasis added.)
*820 “During any abnormal disruption of the market for consumer goods and services vital and necessary for the health, safety and welfare of consumers, resulting from stress of weather, convulsion of nature, failure or shortage of electric power or other source of energy, strike, civil disorder, war, national or local emergency, or other cause, no merchant shall sell or offer to sell any such consumer goods or services for an amount which represents an unconscionably excessive price. * * *
“Whether a price is unconscionably excessive is a question of law for the court. Evidence that (a) the amount charged represents a gross disparity between the price of the goods or services which were the subject of the transaction and their value measured by the price at which such consumer goods or services were sold or offered for sale by the merchant in the usual course of business immediately prior to the onset of the abnormal disruption of the market or (b)
*821 The respondent acknowledges that the Legislature enacted this statute in response to the public concern about the price and supply of heating oil for the 1979-1980 heating season.
It is initially observed that a strong presumption of validity attaches to statutes and that all legislative enactments are deemed to be constitutional until the invalidity of the law has been proven beyond a reasonable doubt by the person attacking the statute. (McKinney’s Cons Laws of NY, Book 1, Statutes, § 150, subd b, p 314; People v Broadie, 37 NY2d 100.)
“ ‘There is generally a very strong presumption that “the Legislature has investigated and found the existence of a situation showing or indicating the need for or desirability of the legislation” ’ ” (Montgomery v Daniels, 38 NY2d 41, 54; Matter of Quinton A., 49 NY2d 328) and that it “found facts necessary to support the legislation” (Hotel Dorset Co. v Trust for Cultural Resources of City of N. Y., 46 NY2d 358, 370; Benson Realty Corp. v Beame, 50 NY2d 994).
The respondent urges that since section 396-r imposes civil penalties for its violation it must be considered as penal in nature and construed strictly in favor of the party against whom the penalty is sought to be imposed.
On the other hand, the petitioner contends that since the statute is civil in nature it should be liberally construed. Alternatively, the petitioner claims that even if the court finds the statute to be penal in nature it should not be given a strict construction since greater leeway is allowed in the field of business activities, where the acts limited are in a narrow category and deal with purely economic regulation. (Papachristou v City of Jacksonville, 405 US 156, 162; Smith v Goguen, 415 US 566, 573, n 10.)
*822 Subdivision 4 of section 396-r permits the court to enjoin the allegedly unlawful acts and “impose a civil penalty in an amount not to exceed five thousand dollars and, where appropriate, order restitution to aggrieved consumers.”
It is clear that while the statute does impose penalties, the primary purpose of the legislation was to bestow a benefit upon the general public, to wit, to insure that all users of home heating oil would lie able to obtain such at a competitive price and to provide a remedy for the violation thereof.
In general, a statute which prescribes a civil penalty is to be considered penal in nature (McKinney’s Cons Laws of NY, Book 1, Statutes, § 273, p 441; People v Consolidated Edison Co. of N. Y., 41 AD2d 809, mod on other grounds 34 NY2d 646). However, before a court should automatically classify a statute which imposes a civil penalty as penal in nature it must first determine whether “the penalty is imposed for the punishment of a wrong or for the redress of an injury to the individual.’’ (Ward v Bochino, 181 Misc 355, 358, affd 268 App Div 814, mot for rearg and for lv to opp to Court of Appeals den 268 App Div 887, mot for lv to opp den 294 NY 675.) If the former, the statute is penal in nature but if the latter, then it is considered to be remedial (Ward v Bochino, supra).
In the instant case, section 396-r is intended to benefit both the general public by permitting injunctive relief and restitution and to punish the wrongdoer by the imposition of a fine. In other words, section 396-r is a hybrid of civil and criminal remedies.
In this regard, it is well established that where a statute is found to be beneficial to the public, though penal as to some persons, it will receive an equitable construction in order not to defeat its general as well as its specific purpose (McKinney’s Cons Laws of NY, Book 1, Statutes, § 275, p 444; Cotheal v Brouwer, 5 NY 562; People v Abraham, 16 App Div 58).
The court is also aware of the rule which requires that where a hybrid of civil and criminal remedies is capable of definite severance, that part of it which relates to and grants a civil remedy must be read separate and distinct from that part of it which is penal in character and viewed *823 as a separate and independent enactment and construed and interpreted accordingly. (McKinney’s Cons Laws of NY, Book 1, Statutes, § 275; Matter of Fainblatt v Leo Sportswear Co., 178 Misc 760.)
However, in the instant case the statute is not capable of definite severance and the court finds thaf the rule of equitable construction must be applied to the statute.
Black’s Law Dictionary ([rev 4th ed], p 386) defines “equitable construction” as “ [a] contruction of a law, rule or remedy which has regard more to the equities of the particular transaction or state of affairs involved than to the strict application of the rule or remedy; that is, a liberal and extensive construction, as opposed to a liberal and restrictive [construction] ”.
In Read v Dingess (60 F 21, 29) the court stated that the “ ‘modern doctrine is that to construe a statute liberally, or according to its equity, is nothing more than to give effect to it according to the intention of the lawmaker, as indicated by its terms and purposes.’ ” (See Cotheal v Brouwer, supra; People v Big Apple Supermarket, 55 Misc 2d 139.)
In addition, the statute must be construed as a whole and its various sections must be considered together and with reference to each other (People v Mobil Oil Corp., 48 NY2d 192; Abood v Hospital Ambulance Serv., 30 NY2d 295; McKinney’s Cons Laws of NY, Book 1, Statutes, §§ 97, 98, 130).
The court also notes that the words of statute “ ‘should be interpreted where possible in their ordinary, everyday senses.’ * * * Departure from a literal reading of statutory language may, on occasion, be indicated by relevant internal evidence of the statute itself and necessary in order to effect the legislative purpose.” (Malat v Riddell, 383 US 569, 571-572.)
However, this general rule has been modified when the statute regulates commercial activity. In that case, “the standard of ordinary intelligence is one of ‘ordinary commercial knowledge.’ In other words, the statute must be sufficiently definite so as to inform one possessing ‘ordinary commercial knowledge’ of what conduct is prohibited.” (Governor of State of Md. v Exxon Corp., 279 Md 410, 454, affd 437 US 117.)
*824 Petitioner urges that the term “unconscionably excessive price” is no more vague than the terms “unjust and unreasonable rents” (Levy Leasing Co. v Siegel, 258 US 242); “unreasonably low prices” (United States v National Dairy Corp., 372 US 29); “reasonable rent” (People ex rel. Durham Realty Corp. v La Fetra, 230 NY 429); “reasonable variations” for loss or gain of moisture in labeling meat package by weight (Roth Packing Co. v Becker, 530 F2d 1295; affd sub nom. Jones v Rath Packing Co., 430 US 519); “fair and open competition” (Old Dearborn Co. v Seagram Corp., 299 US 183); “reasonable variations” (United States v Shreveport Grain & Elevator Co., 287 US 77); and “unreasonable waste” (Bandini Co. v Superior Ct, 284 US 8); all of which were upheld as constitutional and not found to be void for vagueness.
The Attorney-General also notes that section 396-r is adopted from section 6.111 (subd [1], par [a]) of the Uniform Consumer Credit Code which empowers the “Administrator” to bring an action for injunction to restrain a creditor from “making or enforcing unconscionable terms or provisions of consumer credit sales, consumer leases, or consumer loans” and provides that the court should consider “(c) in the case of consumer credit sales or consumer leases, gross disparity between the price of the property or services sold or leased and the value of the property or services measured by the price at which similar property or services are readily obtainable in credit transaction by like buyers or lessees” (Uniform Consumer Credit Code, § 6.111, subd [3], par [c] ; italics supplied).
The court notes that as of this time this code has not been adopted by New York and that in the eight States which have there has been no judicial determination as to whether or not section 6.111 (subd [3], par [c]) of the Uniform Consumer Credit Code is unconstitutionally vague.
In United States v National Dairy Corp. (372 US 29, reh den 372 US 961, supra) the court held that section 3 of the Robinson-Patman Act (US Code, tit 15, §13a) which makes it a crime to sell goods at “unreasonably low prices for the purpose of destroying competition or eliminating a competitor” was not unconstitutionally vague. In so concluding, the court stated (supra, p 32): “The strong presumptive *825 validity that attaches to an Act of Congress has led this Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language. * * * Indeed, we have consistently sought an interpretation which supports the constitutionality of legislation.”
In Jones v Rath Packing Co. (430 US 519, affg Rath Packing Co. v Becker, 530 F2d 1295, supra).the court held that a California statute which provided that “reasonable variations” caused by loss or gain of moisture would be allowed in labeling meat packages by weight was not void for vagueness. While recognizing that the statute itself did not contain quantitative statements of what weight variations would be considered reasonable, the court found that section 12211 of the California Business and Professional Code was to be read in conjunction with the weight variation statute. The court stated (supra, p 526):
“The standard [section 12211] establishes is straightforward : ‘ [T] he average weight or measure of the packages or containers in a lot of any * * * commodity sampled shall not be less, at the time of sale or offer for sale, than the net weight or measure stated upon the package.’
“In order to determine whether that standard has been violated, local officials * * * follow the statistical sampling procedure set forth in Art. 5.”
Footnote 9 of the decision (supra, p 526) notes that article 5 “ ‘procedure is a statistical determination based upon normal and proven statistical standards.’ ”
Section 2-302 of the Uniform Commercial Code provides:
“ (1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.
“(2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present *826 evidence as to its commercial setting, purpose and effect to aid the court in making the determination.”
Cases under section 2-302 have uniformly held that a contract will be found unconscionable on the basis of price when there is a great disparity between the selling price of the goods and its actual market value. (See Miami Tribe of Oklahoma v United States, 281 F2d 202, cert den 366 US 924.) Thus, unconscionability has been found in an installment contract where a freezer worth $300 was sold for a price in excess of $1,400 (Jones v Star Credit Corp., 59 Misc 2d 189 [Wachtler, J.]; see Frostifresh Corp. v Reynoso, 54 Misc 2d 119 [freezer which cost seller $348 sold for $1,145]); or where jade carvings worth $14,750 were sold for a price of $67,000 (VomLehn v Astor Art Galleries, 86 Misc 2d 1).
In the instant case the unit price is expressed in cents per gallon but the disparity may nevertheless be significant since the ultimate gross price reflects a volume purchase.
What is unconscionable in this area is a matter of degree and within the judgmental power of the vendor. If he unduly expands the parameters of this term to gain an advantage in a noncompetitive market he does so at the risk of a contrary finding by a court.
The limiting price cannot readily be expressed by statute in an area with a changing and fluctuating market. An unconscionable price is a significant variant from the market price for these goods as defined by the statute.
In United States v Cohen Grocery Co. (255 US 81) the court held unconstitutional a criminal statute which made it unlawful for any person “to make any unjust or unreasonable rate or charge in handling or dealing in or with any necessaries”. In so concluding, the court held that the statute failed to provide an ascertainable standard adequate to inform the accused of the specific act proscribed by the statute. “Observe that the section forbids no specific or definite act. It confines the subject-matter of the investigation which it authorizes to no element essentially inhering in the transaction as to which it provides. It leaves open, therefore, the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against.” (United States v Cohen Grocery Co., supra, p 89.)
*827 But Cohen involved a criminal statute “without a meaningful referrent in business practice or usage” and set forth “ ‘no accepted and fairly stable commercial standard which could be regarded as impliedly taken up and adopted * * *’ (Small Co. v. American Sugar Rfg. Co., 267 U.S. 233, 240-241)” (United States v National Dairy Corp., 372 US 29, 36, supra).
In the statute under review, the use of the term unconscionably excessive price does not render the statute vague. Standards have been set.
Nor does the variant “grossly excessive prices” adversely affect the constitutionality of this statute.
The term “trade area” should be viewed as synonymous with the term “relevant market”, to wit, the “area in which the seller operates, and to which the purchaser can practicably turn for supplies” (Tampa Elec. Co. v Nashville Co., 365 US 320, 327).
The vendor of home heating oil operates within the range of his mobile equipment frequently overlapping circles of influence of others in the same business.
Trade area in this case encompasses these markets and those others whose proximity and similarity are evident examples of price patterns. It need not be geographically defined to render this statute constitutionally valid.
The respondent also urges that the term “abnormal disruption of the market” is vague and that it is impossible for a merchant to determine when such condition exists or when it began. This point is without merit.
A specific finding was made by the Legislature as to the 1979-1980 home heating oil season and the burden shifts to respondent to rebut the “ ‘very strong presumption that “the Legislature has investigated and found the existence of a situation showing or indicating the need for or desirability of the legislation” ’ ” (Matter of Quinton A., 49 NY2d 328, 336, supra) and that the Legislature “found facts necessary to support the legislation” (Dorset Hotel Co. v Trust for Cultural Resources of City of N. Y., 46 NY2d 358, 370, supra; Benson Realty Corp. v Beame, 50 NY2d 994).
Further, this legislation is inert until a similar finding is made with respect to any future heating season.
*828 CONCLUSIONS
(1) Section 396-r of the General Business Law (L 1979, ch 730) is a price control statute and therefore is unconstitutional in that it conflicts with the Emergency Petroleum Allocation Act of 1973 (US Code, tit 15, § 751 et seq., as amd in 1975) and its implementing directives and regulations which exempt home heating oil from price regulation, an area in which the Congress intended to occupy the entire field.
(2) The language of the statute is not constitutionally vague or overbroad and does not violate the due process rights of respondent.
(3) This ruling ife limited to home heating oils.
(4) In view of the foregoing conclusion No. 1, the court need not reach the issue as to the propriety of using subdivision 12 of section 63 of the Executive Law as a vehicle for bringing this proceeding.
(5) The motion to dismiss the first and second causes of action herein is granted.